# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3597-17T2
A-3598-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.M. and V.B.,

      Defendants-Appellants,

and

E.N.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.M.N.,
Z.B., ZA.B., L.B., ZAR.B., and
Z.U.B.,

      Minors.

_____

Argued March 11, 2019 – Decided April 2, 2019

Before Judges Sabatino, Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0206-18.

Andrew R. Burroughs, Designated Counsel, argued the cause for appellant M.M. (Joseph E. Krakora, Public Defender, attorney; Andrew R. Burroughs, on the briefs).

James D. O'Kelly, Designated Counsel, argued the cause for appellant V.B. (Joseph E. Krakora, Public Defender, attorney; James D. O'Kelly, on the briefs).

Peter D. Alvino, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Nancy P. Fratz, on the brief).

PER CURIAM

In these consolidated appeals, the mother and father of several children seek reversal of the trial court's decision terminating their parental rights after a four-day guardianship trial. The children were removed from the parents because of allegations of abuse or neglect. Three of the children in question

presently live with their maternal grandmother and the other three children have been placed with a maternal great aunt.

The court-approved plan of the Division of Child Protection and Permanency ("the Division") is for the maternal grandmother to adopt the three children who are in her care, and for the maternal great aunt to likewise adopt the other three children. The Law Guardian for the children supports that plan, and joins with the Division in urging that we affirm the trial court's decision.

For the reasons that follow, we affirm the trial court's determination that the Division met its burden of proof at trial with respect to the first two prongs of the termination statute, N.J.S.A. 30:4C-15.1(a), as to both parents. However, we remand this case with respect to prongs three and four of the statute specifically to: (1) develop the trial record with more clarity as to whether each resource parent unequivocally, unambiguously, and unconditionally wishes to adopt the children in her care, regardless of the potential alternative of Kinship Legal Guardianship ("KLG"); and (2) obtain explicit findings by the trial court addressing KLG as it relates to the feasibility of adoption and the unequivocal consent of the resource parents to adoption. In all other respects, we uphold the trial court's otherwise well-founded and well-reasoned decision.

Although the record in this case is extensive, we need not detail it exhaustively here. We summarize only the salient facts pertinent to our discussion.

Defendant M.M.[1] ("the mother") is the biological mother of seven children: X.M. ("Xander"), born in October 2008; K.M.N. ("Kevin"), born in October 2009; Z.B. ("Zarah"), born in September 2011; Za.B. ("Zena"), born in August 2013; L.B. ("Larry"), born in April 2015; Zar.B. ("Zadie"), born in July 2016; and Z.U.B. ("Zelda"), born in September 2017.

Xander was placed in the custody of his father, D.B. The court dismissed Xander from this litigation in January 2017.

Defendant E.N. is the father of Kevin. The trial court terminated E.N.'s parental rights after the guardianship trial, which he did not attend. E.N. has not appealed the court's decision respecting him and Kevin.

Defendant V.B. ("the father") is the husband of the mother. He is the father of the mother's youngest five children, i.e., Zarah, Zena, Larry, Zadie, and Zelda.

---

[1] We use initials and pseudonyms to protect the identity of the children. See R. 1:38-3(d)(12).

As of the time of the guardianship trial in 2018, the Division had been involved with the mother and her children for about eight years, and with the father for approximately six years. The Division initially removed Xander and Kevin from the mother's care in February 2010 after receiving reports that she left Kevin on his paternal relatives' porch unattended. Those two sons were temporarily returned to the mother's custody in October 2015. Meanwhile, Zarah, Zena, and Larry were born, and defendants married.

In December 2015, the Division learned that Larry, who was then about seven months old, had fallen off a bed and was burned by a radiator while in the father's care. The incident was investigated and established as to the father's neglect, but the Division did not remove the children at that time.

In July 2016, the Division removed all of the children from defendants' care because the mother had tested positive for marijuana upon Zadie's birth, and because caseworker interviews with the children had raised concerns about physical abuse. Kevin and Larry were placed with the maternal grandmother. Zarah, Zena, and Zadie were placed with the maternal great aunt.

The Division filed a complaint of guardianship in the Family Part in September 2017. That same month the youngest child, Zelda, was born. The

A-3597-17T2

Division removed Zelda from defendants' care and placed her with the maternal grandmother, adding Zelda to its amended guardianship complaint.

The evidence at the four-day trial reflected that defendants have struggled to be capable as parents. The evidence is replete with repeated marijuana use by both parents, an inability of the parents to provide their own stable home, unemployment, and indicia of failures to supervise the children, including the radiator incident in which Larry sustained second-degree burns. Both parents have psychological difficulties, for which they have received some counseling.

The Division made numerous attempts over the years to provide the parents with services and to reunify them with their children. The Division's key testifying witness at trial, Karen D. Wells, Psy.D., initially in 2011 had "cautiously supported" the gradual reunification of the children with the mother. Dr. Wells later issued an expert report in 2013, again recommending a path towards reunification. However, as time passed, Dr. Wells changed her opinion and ultimately concluded that the children are better off if they are kept with and adopted by their respective resource parents.

The father presented testimony from a psychiatrist, Barry A. Katz, Ph.D., to rebut the expert opinions of Dr. Wells. After performing bonding evaluations of the children and a psychological evaluation of the father, Dr. Katz concluded

that it would do more harm than good to sever the father's parental rights. He predicted that such a termination would place the children at risk for conduct and emotional problems, and difficulties at school. Dr. Katz recommended an additional four-to-six month period to reassess the circumstances.

The record at trial showed the Division has provided substantial services to both parents. Among other things, those services included substance abuse treatment, domestic violence and anger-management counseling, homemaker services, temporary rental assistance, and other programs. In addition, up through the time of trial, the Division supported visitation between the parents and the children residing with the resource parents. The mother in particular visited frequently with the children, with the acquiescence of her own mother and the children's maternal great aunt. The father likewise had contact with the children during the litigation, albeit seemingly with less frequency.

Although there have been lapses, both parents have substantially taken advantage of the services provided to them. Nevertheless, the mother continued to smoke marijuana and repeatedly tested positive for such drug use up through at least February 2017. The mother contends that there is no proof that she has ever harmed or neglected the children when she was under the influence of marijuana or any other drug. The father, meanwhile, has had repeated relapses,

7

although he tested negatively for marijuana for approximately a year before the trial.

As of the time of trial, the parents were both employed. They had an apartment, but one not large enough to accommodate all six children. They were hoping to save money eventually to rent a larger apartment.

After considering this and much more extensive evidence, the trial judge concluded the Division had proven all four prongs of the termination statute by the level of clear and convincing evidence required by N.J.S.A. 30:4C-15.1(a). In particular, the judge found the expert opinions of the Division's expert, Dr. Wells, more persuasive than those of the competing defense expert, Dr. Katz. The judge found significant the Division's eight years of efforts to try to stabilize the family, and to provide services, all of which were unsuccessful in reunifying the children with their parents.

The judge noted the close bonds between the maternal grandmother and maternal great aunt and the children in their respective homes, and she found that both resource parents wish to adopt the children presently in their care. The judge found the termination of the parents' rights to enable such adoption consistent with the children's best interests.

## II.

### A.

We begin our discussion by acknowledging that the termination of a parent's rights to his or her children raises issues of a constitutional dimension. See, e.g., In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999); see also In re Guardianship of J.C., 129 N.J. 1, 9-10 (1992). The Legislature has recognized the importance of this constitutionally protected relationship between a parent and a child by imposing a high burden upon the Division to terminate those rights in a guardianship case. That burden requires the Division to prove, by clear and convincing evidence, the following four prongs under N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement

outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a); <u>see also</u> <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 604-11 (1986) (reciting the four controlling standards later codified in Title 30).]

On appeal, the mother challenges the trial court's adverse findings as to all four prongs. The father concedes the sufficiency of the evidence against him as to prong one, but he contests the trial court's analysis as to prongs two, three, and four. Both parents include in their various arguments a contention that the trial court did not sufficiently consider the option of KLG with the resource parents as a possible alternative to adoption.

In considering these arguments on appeal, we must give substantial deference to the trial judge as the fact-finder who presided over this multi-day guardianship trial. Our scope of review on appeals from orders terminating parental rights is limited. In such cases, the trial court's findings generally should be upheld so long as they are supported by "adequate, substantial, and credible evidence." <u>N.J. Div. of Youth & Family Servs. v. R.G.</u>, 217 N.J. 527, 552 (2014). A decision in such cases should only be reversed or altered on appeal if the trial court's findings were "so wholly unsupportable as to result in

10

a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

We must take into account the trial judge's opportunity to have observed the trial witnesses first hand and to evaluate their credibility. R.G., 217 N.J. at 552. We also must recognize the considerable expertise of the Family Part, which repeatedly adjudicates cases brought by the Division under Title 9 and Title 30 involving the alleged abuse or neglect of children. See, e.g., N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012).

### B.

Having applied these standards to the record and the trial court's findings in light of the applicable substantive law, we affirm the trial court's decision with respect to prongs one and two of the statute. We do so substantially for the reasons articulated in the trial judge's extensive written decision dated March 29, 2018.

Although we agree with much of the trial court's analysis with regard to prongs three and four of the statute, we presently are unable to affirm the final judgment as to those prongs. That is because the factual record, which is based upon a series of somewhat inconsistent and conditional hearsay statements, is

11

insufficiently clear with respect to issues concerning adoption and the potential alternative of KLG. Moreover, the trial court did not mention KLG in the course of its written analysis even though it was a facet of the parties' closing arguments. Before we address these thorny adoption and KLG issues, we briefly comment on the other aspects of the case.

1.

The mother's appeal as to prong one is unpersuasive. There is ample credible factual evidence and expert opinion in the record to support the trial judge's finding that the mother's conduct has endangered the children in their safety, health, and development. We appreciate the mother's argument that a parent's marijuana use does not necessarily translate, per se, into child abuse or neglect. See N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 464 (App. Div. 2014). We also recognize, as the mother argues, that a parent's poverty is insufficient to support a finding of child abuse or neglect. In re Guardianship of J.C., 129 N.J. at 20-21.

The trial judge was appropriately mindful of these principles in nevertheless concluding from the evidence that the mother has endangered the children by repeatedly failing to provide a stable home environment for them. The mother has failed to take sufficient advantage of the services offered to her,

including substance abuse treatment, has persisted in her drug use, and has been unable to provide secure housing for the children. See N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013) (noting that "[w]hen the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition," prong one of the statute is proven). The findings of Dr. Wells, who the trial judge found to be credible, addressing this prong and the risks to the children, further support the judge's conclusions.

### 2.

As to prong two, we are likewise satisfied the trial judge had sufficient evidential support to conclude under the statute that the mother has been "unwilling or unable to eliminate the harm facing the child[ren] or is unable or unwilling to provide a safe and stable home for the child[ren] and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). As the judge's opinion rightly notes, the Division has worked with this family for over eight years. Despite the efforts made to date, the mother still has been unable to eliminate the harm and provide a safe and stable home.

We recognize the father's compliance with various services, but, as the judge's opinion notes, the father has yet to demonstrate that he can "provide a safe, secure, and stable environment." Dr. Wells' expert opinion that the father does not have the capacity to care for the children, either independently or as a co-parent with the mother, supports this conclusion.

As the statute instructs under prong two, "[s]uch harm may include evidence that separating the child[ren] from [their] resource family parents would cause serious and enduring emotional or psychological harm to the child[ren]." Ibid. That is precisely what the credible expert opinions of Dr. Wells underscored. There is more than ample proof that removing the children from, respectively, the maternal grandmother and the maternal great aunt, would cause the children major emotional and other harm.

Moreover, the "delay of a permanent placement" is particularly salient in a family, such as this one, which has been involved with the Division for nearly a decade. "Children must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209-10 (App. Div. 2007); see also N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 146-47 (2018) (emphasizing the importance of prompt

14

judicial determinations of issues in cases involving children awaiting permanency). We affirm the trial court as to this prong as well.

3.

Turning to prong three, we are satisfied that the record readily supports the trial judge's finding that the Division has made "reasonable efforts" to provide appropriate services to both parents. As we have noted, the parents have made use of many of these services, albeit inconsistently at times. We pause, however, with regard to the last clause of prong three set forth in N.J.S.A. 30:4C-15.1(a)(3) regarding the adequacy of the trial court's consideration of "alternatives to termination of parental rights," and defer our discussion on that point to the KLG portion of this opinion in Part II(C).

4.

Lastly, subject to the KLG caveat, the trial judge provided a reasonable basis for her conclusion on prong four that the termination of both parents' rights will not do the children more harm than good under N.J.S.A. 30:4C-15.1(a)(4). As the finder of fact, the trial judge had the prerogative to evaluate the credibility of the testimony of the competing experts, and to find the opinions of Dr. Wells about the children's best interests more persuasive than those of Dr. Katz. City of Long Branch v. Liu, 203 N.J. 464, 491 (2010) (explaining the fact finder has

15

the role of assessing the credibility and weight to be given to expert testimony); Angel v. Rand Express Lines Inc., 66 N.J. Super. 77, 85-86 (App. Div. 1961) (same).

The present case concerns a distinctive situation in which both resource parents happen to be close relatives of one parent (the mother's mother and the mother's aunt). The children have enjoyed visits from the parents with considerable frequency.[2] The record also suggests that the children, the resource parents, and defendants at time have spent holidays together and attended religious services. The children have been capably raised by their grandmother and great aunt for many years. They have bonded with them and have been cared for well. Subject to the KLG concerns we will address, infra, the Division's goal of adoption by the resource parents, with the expectation and

---

[2]  The trial court initially permitted visitation between the children and the parents while the appeal was pending. However, we were advised in a pre-argument status update that we requested from counsel that, as the result of an incident in the summer of 2018, the trial court has since disallowed such visitation as to the children staying with the maternal grandmother in an order issued in the "FC" docket. The Division and the Law Guardian do not rely on such post-trial developments to support their arguments for affirmance. We will accordingly ignore this post-judgment information and do not rely upon it to defendants' disadvantage, either. We do appreciate counsel's assistance in providing the update information, and recognize it was not required to be supplied under Rule 2:6-11(f) (regarding updates of changes of a child's "placement status" while an appeal is pending) before we inquired.

hope they would continue voluntarily to nurture the children's relationships with their mother and father, appears from the trial proofs to have several advantages.

C.

1.

This brings us to the issue of the potential alternative of KLG to the termination of defendants' parental rights. The Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to -7, which authorizes KLG, was enacted because "the Legislature recognized that an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 222-23 (2010).

As the statute creating KLG declares, "[i]n considering kinship legal guardianship, the State is seeking to add another alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights, for caregivers in relationships where adoption is neither feasible nor likely[.]" N.J.S.A. 3B:12A-1(c). "[T]he purpose of this alternative legal arrangement is to address the needs of children who cannot reside with their parents due to their parents' incapacity or inability to raise them and when

17

adoption is neither feasible nor likely." S.F., 392 N.J. Super. at 209; see also P.P., 180 N.J. at 508.

Typically, KLG guardians will be caregivers who have a "biological, legal, extended or committed emotional or psychological relationship with a child[.]" P.P., 180 N.J. at 508 (quoting S. Budget and Appropriations Comm. Statement to S. 1813 (June 25, 2001), reprinted in N.J.S.A. 3B:12A-1). They must be "willing to assume care of the child due to parental incapacity or inability, with the intent to raise the child to adulthood." Ibid. (quoting S. Budget and Appropriations Comm. Statement to S. 1813 (June 25, 2001), reprinted in N.J.S.A. 3B:12A-1).

"Once [a] caregiver becomes a kinship legal guardian, the caregiver is entitled to make all decisions relating to the care and well-being of the child." N.J. Div. of Youth & Family Servs. v. D.H., 398 N.J. Super. 333, 340 (App. Div. 2008) (citing N.J.S.A. 3B:12A-4(a)(1)). As this court has further explained:

> KLG, however, does not terminate parental rights. . . . The birth parents retain the right to: (1) consent to adoption . . . (2) change the child's name . . . and (3) visit the child . . . . The birth parents also remain obligated to pay child support. . . . Additionally, children are still eligible to receive inheritance, benefits, or insurance from their birth parents.

[Id. at 341 (citations omitted) (citing N.J.S.A. 3B:12A-4a(2)-(5)).]

In order to conclude that a KLG arrangement is appropriate, the court must find that:

(1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;

(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;

(3) in cases in which the [D]ivision is involved with the child . . . (a) the [D]ivision exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and

(4) awarding kinship legal guardianship is in the child's best interests.

[N.J.S.A. 3B:12A-6(d) (emphasis added).]

The decision of a resource parent to choose adoption over KLG must be an informed one. See H.R., 431 N.J. Super. at 232-33. In deciding whether or not to appoint a caregiver as a KLG, the judge must decide if KLG is in the child's best interests and – when the Division is involved with the parents – if the Division has made reasonable efforts at reunification and if the adoption of the child "is neither feasible nor likely." N.J.S.A. 3B:12A-6(d).

19

The Legislature has made it clear that relative caretakers who might be candidates for KLG must be adequately informed of the nature of such arrangements and the financial and other services for which they may be eligible. To achieve that objective, the Legislature enacted in 2005 the Kinship Legal Guardianship Notification Act ("Notification Act"), N.J.S.A. 30:4C-89 to -92. In the Act, the Legislature imposed a responsibility upon the State "to ensure that individuals who may be eligible to become kinship legal guardians are aware of the eligibility requirements for, and the responsibilities of, kinship legal guardianship and . . . [also] the services available to kinship legal guardians in the State." N.J.S.A. 30:4C-90(e).

To implement this notification mandate:

> The Department of Children and Families[3] shall, in easily understandable language:
>
> a. inform individuals, of whom the department is aware, who may be eligible to become kinship legal guardians of:
>
> (1) the eligibility requirements for, and the responsibilities of, kinship legal guardianship; and

---

[3] The statute was amended in 2012 to substitute the Department of Children and Families for the Department of Human Services. See L. 2012, c. 16, § 112 (eff. June 29, 2012).

(2) the full-range of services for which kinship legal guardians may be eligible and the eligibility requirements for those services; and

b. inform current kinship legal guardians of the full-range of services for which kinship legal guardians may be eligible and the eligibility requirements for those services.

[N.J.S.A. 30:4C-91].

The statute further directs that the Commissioner of the Department "shall adopt rules and regulations . . . to effectuate the purposes of [the statute]." N.J.S.A. 30:4C-92.[4] No published cases to date have interpreted the notification statute.

The Division has asserted that the KLG statutory scheme must be construed with a focus upon the requirement in N.J.S.A. 3B:12A-6(d)(3)(b) that, in cases such as the present one in which the Division has been involved with the child, KLG is appropriate only if "adoption of the child is neither feasible nor likely." In a number of published opinions involving arguments by terminated parents advocating KLG, our courts have enforced this requirement that adoption must not be feasible or likely. See, e.g., P.P., 180 N.J. at 513; N.J. Div. of Youth & Family Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011).

---

[4] Our research has not found any such adopted regulations, and none have been cited in the parties' briefs.

The Division argues that the statutory scheme must be construed to treat the caregiver's role as simply deciding whether he or she is willing to adopt the child in question. According to the Division, a caregiver's preference of KLG versus adoption is inconsequential. The Division argues that giving credence to caregiver's preference would result, in effect, in placing the caregiver in an inappropriate position of rendering non-expert opinions concerning the child's best interests, a question reserved for the Family Part judge. Moreover, the Division expresses concerns that asking a caretaker who is willing to adopt a child whether he or she would prefer instead a lesser role through a KLG arrangement inappropriately clouds the legal analysis and injects an unwarranted comparison of adoption-versus-KLG into the analysis.

Although we appreciate these concerns and agree that the caregiver should not be placed in the role of functioning as the ultimate "decision-maker" as to a child's fate, we do not regard the preferences, if any, of the caregiver to be categorically irrelevant. A logical implication of the Notification Act is that the caregiver must be fully informed of the potential benefits and burdens of KLG before deciding whether he or she wishes to adopt. Once he or she is provided with that comparative information, the caretaker's preference between the two alternatives should matter.

A-3597-17T2

The paradigm is somewhat akin to the principle of informed consent, and its corollary principle of informed refusal, in health care. A physician may not proceed with a medical procedure that had been fully described to an informed patient if the patient states that he or she would prefer to pursue less drastic measures (such as medication or physical therapy) before undergoing a more drastic option (such as surgery).[5] In such a comparative situation, the patient may be amenable to the more drastic alternative but would rather attempt the less drastic one, as between those two alternatives.

To take a more everyday and less monumental example, suppose a teenager asks her parent if she can drive the family car to a party. The parent may respond, "Yes, but only if none of the other parents can drive you." In this

---

[5] Analogous case law in medical negligence matters describes informed consent as a concept in which a person supplied with adequate knowledge chooses among the alternative options presented to him or her. See, e.g., Jarrell v. Kaul, 223 N.J. 294, 311 (2015) (explaining informed consent as a concept "predicated on the duty of a physician to disclose to a patient such information as will enable the patient to make an evaluation of the nature of the treatment and of any attendant substantial risks, as well as of available options in the form of alternative therapies.") (emphasis added) (quoting Largey v. Rotham, 110 N.J. 204, 208 (1988)); Matthies v. Mastromonaco, 160 N.J. 26, 28-29 (1999) (holding "to obtain a patient's informed consent to one of several alternative courses of treatment, the physician should explain medically reasonable invasive and noninvasive alternatives, including the risks and likely outcomes of those alternatives, even when the chosen course is noninvasive.") (emphasis added).

23                                                    A-3597-17T2

situation, the parent would prefer to have someone else drive the child, and her informed consent is only conditional on such other options being unavailable.

Although these analogies may not be completely on point, they are somewhat instructive. Indeed, a leading New Jersey treatise on child custody and child protection issues describes the caretaker's "decision to choose" adoption over KLG as a choice, which "must be an informed one." Fall & Romanowski, Current N.J. Family Law, Child Custody, Protection & Support § 18:3-4(c) (2018).

Moreover, the KLG statute requires the court to consider the "wishes" of the child's parents and, if the child is over the age of twelve, the "wishes" of the child. N.J.S.A. 3B:12A-6(a)(6) and (7). Logically, the "wishes" of the caregiver also should bear upon the analysis. In addition, the KLG statute requires the court to consider "the commitment of the kinship caregiver and the caregiver's family to raise the child to adulthood." N.J.S.A. 3B:12A-6(a)(10). A fair judicial assessment of that "commitment" reasonably includes consideration of whether the caregiver's position is qualified or diluted by a preference for an alternative option, or is predicated upon some other conditions or expectations being fulfilled.

In sum, we construe the KLG statute and the Notification Act to make a caregiver's preference, if any, of KLG over adoption a relevant but not dispositive consideration. The caregiver's consent to adopt should be not only informed, but also unconditional, unambiguous, and unqualified.

We are mindful that, as the Supreme Court stated in P.P., 180 N.J. at 513, a case decided before the 2005 passage of the Notification Act, "when the permanency provided by adoption is available, kinship legal guardianship cannot be used as a defense to termination of parental rights . . . ." We are also cognizant that the Court made clear in P.P. that if the defendants were not fit to parent their children, "the trial court should not consider [KLG] unless . . . [the resource parents] decline[d] to adopt." Id. at 514. In faithfully adhering to those admonitions, however, it is also vital that the evidence before the trial court regarding the caregivers' intentions has sufficient clarity and evidential reliability.

As this court observed in T.I., 423 N.J. Super. at 130, following the enactment of the Notification Act, "when a caregiver in a case brought by the Division . . . unequivocally asserts a desire to adopt, the finding required for a KLG that 'adoption of a child is neither feasible nor likely' cannot be met." (Emphasis added). Such unequivocal evidence was presented in a "compelling"

25

manner in T.I., in which the child's paternal grandfather testified at the guardianship trial and stated "unequivocally" that he and his wife wanted to adopt the child. Id. at 136. The adoptive grandfather attested that the Division had explained the difference between adoption and KLG, that he had "given the matter careful consideration," and that he believed KLG would "threaten the stability" the child enjoyed in his family. Ibid. The grandfather also testified that "there was no event or circumstance he could envision that would change his mind." Ibid.

Given this unequivocal testimony in T.I., we rejected the parent's argument that the trial court should have considered KLG as an alternative to termination. The grandfather's testimony "show[ed] that he clearly understood the alternatives and that his reasons for rejecting a KLG were consistent with the Legislature's stated goals." Id. at 137. "[T]he trial court did not abdicate its obligation in accepting [the grandfather's] testimony, which clearly defeated any finding that adoption was not feasible or likely." Ibid. (emphasis added). Hence, there was no need in T.I. "to determine whether KLG was in the best interest" of the child. Ibid.

By contrast, the record in this case is muddy. The documents in the record and the testimony of the lay and expert witnesses in this case refer in various

places to KLG. To be sure, that evidence reflects, and it is undisputed, that there were repeated discussions by Division staff with, respectively, the maternal grandmother and the maternal great aunt concerning KLG. In addition, the father's expert, Dr. Katz, discussed KLG with at least the maternal great aunt. Dr. Katz addressed KLG in his pretrial expert report and, over objection, in his trial testimony. Dr. Wells, the Division's expert, did not explicitly discuss KLG in her trial testimony or in the analytical portion of her report. However, she did opine that adoption was feasible for both resource parents and she recommended termination to enable such adoption.

Unlike in T.I., neither of the resource parents in this case testified. Consequently, the communications by and with them concerning adoption and KLG are all hearsay statements, a circumstance which we recognize is not unusual in guardianship litigation. The mother's trial attorney objected to hearsay contained in the Division's contact sheets. The trial judge ruled as follows:

> [THE COURT]: And then, again, your final [objection] is all the hearsay contained in the evidence packet, especially P-313. You may make objections as we go along. Absolutely. And any hearsay that there's no exception for is not admissible.

The father's trial attorney later objected on hearsay grounds to the supervisor's testimony regarding her discussions of KLG with the resource parents. The judge sustained that objection and did not permit the supervisor to elaborate on the hearsay discussion.

2.

Noting these evidentiary rulings, we now proceed to discuss, in roughly chronological form, the evidence respecting each of the resource parents on this subject.

First, a Division caseworker's entry in a contact sheet reflects that in September 2012, the maternal grandmother stated she wanted to adopt her grandsons Xander and Kevin. This statement is of only partial relevance concerning Kevin, since the placement of Xander is not challenged and he is not one of the six children at issue in this case.

The Division again discussed adoption and KLG with the maternal grandmother in 2013. The contact sheets from that time period reflect that the maternal grandmother again was willing to adopt Xander and Kevin, and she apparently filled out adoption "paperwork."

According to a later contact sheet on August 7, 2015, the maternal grandmother told a caseworker, in conditional words, that she would "consider

obtaining sole custody of [Xander and Kevin] <u>if</u> she will be able to obtain public assistance for them."  (Emphasis added).  The maternal grandmother further ambiguously stated to the caseworker "she is also <u>willing to adopt or get KLG</u> for [Kevin and Xander]."  (Emphasis added).

On October 2, 2015, a caseworker met with the maternal grandmother, who informed the caseworker she believed the Division was planning to return Xander and Kevin to their mother.  According to the contact sheet, the maternal grandmother at that time "mentioned that she <u>does not want to adopt</u> [the two boys] because she <u>does not believe [the mother] is such a bad parent</u> that deserves her parental rights to be terminated."  (Emphasis added).  Additionally, the entry states that the maternal grandmother "indicated that she has been reading about KLG in the Division's web page and she is <u>considering doing KLG</u> for [Xander and Kevin]."  (Emphasis added).  The caseworker advised the maternal grandmother to "talk with the local [Division] office worker and supervisor to discuss the matter."  Later that month, the court ordered the children to be immediately reunited with the mother.

The Division removed the children from the mother and father once again in July 2016 following the mother's positive drug test at Zadie's birth.  The

children were thereafter placed respectively with the maternal grandmother and the maternal great aunt.

On September 22, 2016, a caseworker spoke with the parents about the possibility of entering into a KLG for Kevin with the maternal grandmother. The parents stated they wanted to be reunified with all of their children. The mother expressed concerns that KLG would "build a wedge" between her and the maternal grandmother.

A few months later, on December 13, 2016, the maternal great aunt reportedly told a caseworker that, with respect to the children in her care, she was "willing to adopt or do kinship legal guardianship as long as she receive[d] financial assistance." (Emphasis added).

Further discussions with the resource parents concerning adoption and KLG occurred in 2017. On March 21 of that year, the maternal grandmother reportedly told a caseworker that she had "researched" KLG and adoption, and that she "underst[ood]" the difference between them. The contact sheet indicates the maternal grandmother "did not want to discuss KLG and adoption because [she felt] her opinion on the matter was not acknowledged last time." In particular, the maternal grandmother reportedly stated that she had "wanted KLG with [Kevin and Xander] and the children were [nonetheless] reunified"

30

with their mother.[6] The maternal grandmother articulated frustration that she had "addressed the judge and expressed her stance [but] reunification still proceeded." Reportedly, the maternal grandmother further stated she did not think the mother and father were ready to parent "because they did not have the proper resources," and that "she did not want the children to be moved" from her own care.

That same day, March 21, 2017, the caseworker separately met with the maternal great aunt, and reviewed with her the differences between adoption and KLG. According to the contact sheet, the maternal great aunt reportedly stated at that time "she is willing to adopt," and she signed an acknowledgment "receipt" confirming that.[7]

On April 5, 2017, a caseworker met with the maternal grandmother and again reportedly discussed with her the differences between adoption and KLG. This contact sheet contains a somewhat confusing entry, indicating that the maternal grandmother "felt more comfortable with proceeding with a plan for

---

[6] This is confusing, because the maternal grandmother had seemingly expressed a previous desire to adopt, not to have KLG. The trial testimony does not enlighten us as to whether this was a misperception of the maternal grandmother's actual comment or whether the grandmother may have been confused.

[7] The "receipt" does not appear to be in the trial record.

permanency."  The comment does not clarify what the maternal grandmother meant by this, since both adoption and KLG involve permanent future relationships.  Apparently, the maternal grandmother reportedly did state that she "understood it was the court that authorized KLG or adoption," rather than the Division.  The contact sheet also stated that the maternal grandmother was "committed to the children long term, via adoption, if the courts approve termination of parental rights."  (Emphasis added).

Later, the maternal grandmother reportedly told the caseworker on August 17, 2017, in response to a question about her "stance on adoption," that she was "committed to her grandchildren and will adhere by [sic] whatever the court decides."  (Emphasis added).  The contact sheet and the trial testimony do not make clearer what this meant.

Meanwhile, another contact sheet reflects on July 11, 2017, the maternal great aunt reportedly told the caseworker that she had read a "fact sheet" concerning adoption and KLG.  According to the contact sheet, this review by the maternal great aunt "satisfied her concerns," and that she was willing to adopt Zarah, Zena, and Zadie.

Following Zelda's birth in September 2017, the newborn child was placed in the maternal grandmother's care with Kevin and Larry.  The caseworker met

with the maternal grandmother on September 12, who reportedly stated that she "wanted to adopt the three children" and that she was "committed to caring for them long term."

Another contact sheet states that on December 21, 2017 the maternal grandmother told the caseworker that she hopes to move to another state after the adoption of the children in her care. According to the contact sheet, the maternal grandmother stated that the area in which she lived had become unsafe and she wanted to move the children to a safer neighborhood. This contact sheet also reflects that the maternal grandmother spoke with the caseworker about how she became interested in adopting the children in her care.

After the Division's expert, Dr. Wells, performed bonding evaluations on December 14, 2017, with the children and the maternal great aunt, Dr. Wells issued a report on January 28, 2018. The report states that the maternal great aunt "has committed to adoption" of Zarah, Zena, and Zadie, and that she is "committed to permanency via adoption." Dr. Wells's analysis does not refer to KLG, apart from mentioning it in the factual background. Dr. Wells also submitted an expert report that same day summarizing her bonding evaluation of the maternal grandmother. The report similarly states the maternal grandmother "has indicated that she is committed to adoption of [Kevin, Larry,

and Zelda], if they become legally free."  Again, the expert report does not expressly mention KLG beyond the factual background.

Dr. Wells's trial testimony did not illuminate any further the resource parents' desires with respect to adoption versus KLG.  Her testimony did not mention KLG, and none of the attorneys asked her about the subject.

In his own expert report dated February 2, 2018, Dr. Katz indicated that the maternal grandmother had stated to him that "she had tried adoption before with the 2 older children [i.e., Xander and Kevin], and that is when the judge had given them back to the biological parents."  According to Dr. Katz, the maternal grandmother told him "she is seeking adoption this time."  Dr. Katz's report is inconsistent, however, with regard to the maternal great aunt's intentions:

> [The maternal great aunt] said she will adopted [sic] the children if the case goes that way.  [The maternal great aunt] said she prefers KLG over adoption.  [The maternal great aunt] said she feels adoption will be more stable for the children.
>
> [The maternal great aunt] said the parents have open visitation at her home.  [The maternal great aunt] said the parents come to visit the children about 2 or 3 times a month.  [The maternal great aunt] denied that there have been any problems with the visits.  [The maternal great aunt] said she would continue to have open visits, even if the children were adopted.

[(Emphasis added).]

At trial, Dr. Katz testified, after an overruled hearsay objection by the Division's attorney, that the maternal great aunt had told him that "she preferred KLG over adoption."

The two Division staff members who testified at trial provided only limited information on these critical subjects. The caseworker who testified had not been assigned to this case until October 2017. The other Division witness, a supervisor, had been the supervisor on the case between October 2015 and about July 2017, and previously had been involved with the family in 2011 or 2012.

The caseworker for the Division provided incomplete testimony on the subject of the resource parents' intentions. On cross-examination by the father's trial attorney, the caseworker testified as follows:

> Q    Starting first with the maternal great aunt, did you take any steps to discuss KLG versus adoption with her?
>
> A    With --
>
> Q    With -- with -- with the aunt.
>
> A    [The maternal great aunt] or --
>
> Q    Yes. Yes.

A Did I take any steps?

Q Right.

A Yes. When I first met her [the maternal great aunt], we talked about my role, and I said that I would be an adoption worker, and she talked about that she was just at court and that <u>they did discuss KLG versus adoption, and she was saying that -- how she wanted to adopt the children, and it was the goal that she wanted</u>.

Q And <u>your conversation with -- with [the maternal grandmother], did you discuss with her</u> the differences between KLG and adoption?

A Yes. Well, again, they were also -- we saw them the same day, and they were at court. And the conversation was at mediation, so they were just telling me about what I had heard at court.

Q And did --

A <u>And we did discuss that</u>.[8]

Q Did you discuss that subject with them together?

A No. Different -- they live in different houses.

[The father's trial attorney]: I have no further questions, Your Honor. Thank you.

[(Emphasis added).]

---

[8] The testimony did not go further to convey the desires of the maternal grandmother.

On cross-examination by the mother's trial attorney, the following limited testimony was elicited about the maternal grandmother's intentions, before the Deputy Attorney General objected:

> Q    You said you did discuss KLG and adoption with regards to the maternal grandmother, correct?
>
> A    <u>Yes.  We did talk about that</u>.
>
> Q    Now from your case records, the Division had discussed those things which happened in the past. Is that correct?
>
> A    Many times.  Yes.
>
> Q    Isn't it correct that, in fact, she did tell the Division that <u>she will adopt to avoid the children being placed outside of her home</u>?
>
> [The Division's trial attorney]:  <u>Objection.  Hearsay</u>.
>
> THE COURT:  <u>It's hearsay</u>.
>
> [(Emphasis added).]

The supervisor explained in her testimony that she had met with the maternal grandmother and maternal great aunt after a proceeding.[9]  According to the supervisor, she at that time "explained the differences between KLG and

---

[9]  The record is murky as to the exact nature of that proceeding and when it occurred.

adoption" to the two resource parents, and had them "give the information back to [her] to make sure they were very clear in their understanding." The supervisor began to relate that the maternal great aunt was "very adamant that she felt like the children needed a chance, that they needed permanency." At that point, defense counsel interposed a hearsay objection, which the court sustained. On cross-examination, the supervisor did acknowledge that the term "permanency" can apply to either adoption or KLG.

In counsel's summations at the close of the trial, they discussed KLG. Defendants advocated KLG, and Kevin's law guardian and the Division opposed it.

3.

In the analytic portion of her written opinion following the trial, the judge did not discuss KLG. The opinion does, however, contain this finding, without elaboration concerning the resource parents' intentions:

> The Court has considered alternatives to [t]ermination and there are no viable alternatives. The children are placed with relatives who want to adopt them.
>
> The Court therefore finds that the Division has met this prong by clear and convincing evidence that reasonable efforts were offered to the parents. There are no alternatives to termination of parental rights as the foster parents want to adopt.

While this appeal was pending, the Law Guardian moved for this court to supplement the record by tendering signed post-trial certifications dated November 10 and 14, 2018, from both the maternal grandmother and the maternal great aunt, in which they attested that they are each committed to adopting the children in their care. Defense counsel opposed that motion, because the certifications were not part of the record presented to the trial judge and defense counsel did not have the opportunity to contest or rebut such proof at trial.[10] Another panel of this court denied that motion.

Even if these post-trial evidentiary proffers are considered, the maternal great aunt does not address or explain the discrepancy between the proffer and her alleged statement to Dr. Katz that she wanted KLG. Nor does the certification from the maternal grandmother make clear why her position has vacillated in the past, and whether her willingness to adopt is unconditional and unqualified.

4.

Viewing all of these bits of hearsay in their totality, we cannot determine with confidence from the present record whether the resource parents – by a level of clear and convincing evidence – are committed unambiguously,

---

[10] The Attorney General took no position on the motion.

unequivocally, and unconditionally to adoption, regardless of the possible alternative of KLG. Both resource parents have made equivocal and ambiguous hearsay statements about this subject at various points in time. For example, the entry in Dr. Katz's report – and his attempted trial testimony attesting that – the maternal great aunt told him that she wanted KLG over adoption is, to say the least, concerning.

The maternal grandmother's hearsay statements seem somewhat more definitive, but they, too, leave reason to doubt whether she ostensibly favors adoption based upon a mistaken premise that adoption is the only "permanency" option, and not KLG. This may not be merely a situation of "initial reluctance," about adoption, see Div. of Youth & Family Servs. v. S.V., 362 N.J. Super. 76, 81, 87-88 (App. Div. 2003), but rather one in which one or both resource parents may be under a mistaken premise. See, e.g., H.R., 431 N.J. Super. at 232-33 (in which we remanded a final judgment of guardianship because the caretaker mistakenly thought that KLG was unavailable for children under the age of twelve). Here, the possible mistaken premise, which the court did not allow defense counsel to explore on cross-examination, is whether the maternal grandmother is willing to adopt because she mistakenly believes that the children would be removed from her if she stated she favored KLG.

The omission of any discussion of KLG within the analytic portion of the trial court's otherwise thorough opinion also gives us pause. The KLG subject was directly addressed by counsel in their competing arguments during summations. To be sure, the court's unelaborated finding that adoption is feasible could be interpreted as an implicit finding that KLG has no bearing or role in this case. But that finding is based upon a rather confusing ambiguous record of a series of hearsay assertions by the two resource parents. We cannot "reverse engineer" the judge's unwritten thought process on the subject. The judge did not explain or reconcile the vacillating and ambiguous statements attributed in hearsay from the maternal great aunt and grandmother.

We by no means wish to prolong this litigation for hyper-technical reasons. We certainly recognize the well-established objective of achieving the children's permanency. Nevertheless, given the important constitutional rights that are at stake, and the stringent clear-and-convincing standards of proof, this record needs to be more definitive on this vital subject.

We are mindful this is an extended family situation. For many years there has been frequent and loving contact between the children, their maternal grandmother, their maternal great aunt, their mother, and their father. The family setting has many characteristics that would seem to make KLG a

41

potentially feasible alternative to adoption.  Of course, if both of the resource parents truly want to adopt – unequivocally, unambiguously, and unconditionally and irrespective of KLG – and termination of parental rights and adoption is clearly in the children's best interests, the final judgment to that effect should be reaffirmed.  For the moment, however, the proofs that were presented at trial are simply too cloudy to support affirmance on this one limited, but vitally important, issue.

5.

The matter is therefore remanded for further proceedings to develop the record more definitively on the adoption/KLG issue and for the rendering of explicit associated findings of fact and conclusions of law.

We defer to the trial court's discretion as to what forms of proof would be appropriate at the remand hearing.  Subject to potential timely objection, we do not require, per se, the testimony of either resource parent, as we appreciate that presenting such testimony and withstanding the rigors of cross-examination by defense counsel may be stressful for the resource parents and possibly disharmonious to the whole extended family.

Of course, if one or both of the maternal grandmother or maternal great aunt are willing to testify nonetheless, we presume the trial court would

42

welcome such evidence. We also defer to the trial court as to whether any supplemental expert reports and testimony are appropriate to address these subjects, given the passage of time and interim events.

We need not resolve here whether it was appropriate for the trial court to admit or consider certain hearsay statements attributed to the resource parents about their views concerning adoption and KLG. For one thing, counsel did not consistently oppose the admission of such hearsay, depending on whether the particular statement supported or undermined the client's trial strategy. For example, the Division's counsel presented the contact sheets and testimony from its witnesses conveying various hearsay statements made by the resource parents, but objected on hearsay grounds when defense counsel comparably presented testimony from Dr. Katz relating that the maternal great aunt had told him she preferred KLG. Reciprocally, defense counsel objected to testimony by the caseworker and supervisor conveying the out-of-court statements of the resource parents but presented such hearsay through Dr. Katz.

"[H]earsay subject to a well-founded objection is generally evidential if no objection is made." N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 348-49 (App. Div. 2016). "When objectionable hearsay is admitted in a bench trial without objection, we presume that the fact-finder appreciates

43

the potential weakness of such proofs, and takes that into account in weighing the evidence." Id. at 349. A problem with the present record is that the resource parents' hearsay was treated in an inconsistent pattern: some it was objected to and excluded, and some of it was allowed. On remand, we trust the hearsay will be handled with consistency. We suggest that a case management conference be conducted to address these evidential issues in limine in light of Rule 5:12-4(d) and case law excluding improper embedded hearsay statements by third parties.

### III.

Affirmed in part and remanded in part. The remand shall be completed within ninety days, unless that deadline is reasonably extended further by the trial court upon the consent of all counsel. We do not retain jurisdiction. Any party may pursue a new appeal from the outcome of the remand. Any issues of interim visitation or contact are reserved for the trial court.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

44