# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3644-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.L.,[1]

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.G.L.,
a minor.

_____

Submitted January 13, 2025 – Decided February 4, 2025

Before Judges Gummer, Berdote Byrne and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0112-22.

---

[1] We refer to the parties and the child by initials and fictitious names to protect their privacy. See R. 1:38-3(d)(12).

Jennifer N. Sellitti, Public Defender, attorney for appellant (John A. Albright, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant T.L. ("Theresa"), the biological mother of minor D.G.L. ("David"), appeals from the July 7, 2023 judgment of guardianship terminating her parental rights to David. Theresa contends the Division of Child Protection and Permanency ("DCPP" or "the Division") failed to prove all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence.

Based upon our review of the record and applicable law, we are satisfied the evidence in the record supports the decision to terminate Theresa's parental rights by clear and convincing evidence. Accordingly, we affirm substantially for the reasons set forth by Judge Margaret M. Marley in her thorough and well-reasoned opinion rendered on July 7, 2023. We do not recite in detail the history of the Division's interactions with Theresa. Instead, we incorporate by reference

2

the factual findings and legal conclusions contained in Judge Marley's decision. We provide an abbreviated summary and add the following additional comments.

## I.

In January 2019, Theresa gave birth to David. Two days after David's birth, hospital staff contacted DCPP to convey that David was healthy, but Theresa would be involuntarily committed to a psychiatric unit due to her history of paranoid schizophrenia and non-compliance with medication. DCPP was granted legal and physical custody of David and temporarily placed him in a non-relative resource home.

Before and after David's temporary placement, DCPP spoke with Theresa about potential relatives who could be considered for David's long-term placement. DCPP completed background checks for all of the relatives Theresa identified, including L.B. and R.W., as well as relatives who had directly contacted DCPP and expressed interest in caring for David. DCPP ultimately placed David with T.H. ("Tara"), the daughter of Theresa's maternal cousin, and Tara's husband, R.P. ("Robert") on January 18, 2019. David has been in their continuous care for the past six years.

A-3644-22

After Theresa's discharge, she began attending outpatient services and taking monthly injections of psychiatric medication to treat her diagnosis of paranoid schizophrenia. DCPP organized supervised visits between Theresa and David, provided transportation services, and offered Theresa therapeutic services. It is undisputed Theresa complied with therapy and her medication regime throughout the course of the litigation. However, the supervised-visitation facility reported concerns with Theresa's ability to parent David. Although Theresa consistently attended supervised visits with David, she struggled with implementing recommendations and had difficulty engaging with David for longer periods of time.

Since David's removal, Theresa has asserted on numerous occasions she does not believe she suffers from schizophrenia and does not need to take medication for her mental illness. Instead, she claimed to do so at DCPP's and the court's insistence and to maintain her Social Security benefits.

In June 2021, Theresa tested positive for phencyclidine ("PCP") twice and positive for marijuana once. She began attending a substance-abuse treatment program but tested positive for alcohol while enrolled in the program in September 2021. Theresa also self-reported alcohol use in November 2021.

A-3644-22

Before DCPP filed the Title 30 complaint, the Division discussed kinship legal guardianship ("KLG") as an alternative to terminating Theresa's parental rights with David's resource parents. Although the resource parents initially agreed to pursue KLG instead of adoption, they later changed their position and became interested only in adoption after learning Theresa intended to request custody of David soon after KLG was granted, have David visit her at her home, and take David to visit his incarcerated biological father.[2]

After DCPP filed a complaint commencing this guardianship matter on May 11, 2022, another of Theresa's maternal cousins, L.B., and that cousin's mother, R.W., informed DCPP, for the first time, of their interest in becoming kinship legal guardians of David. However, neither of them had interacted with or seen David since his birth in January 2019. Also, they were initially ruled out as caregivers after Theresa had identified them in 2019. DCPP issued a written response to their request in 2022, informing them David would not be placed with them because it would disrupt David's current placement in a pre-adoptive home, which would not be in his best interest.

---

[2] David's biological father, S.M., is not a party in this matter. He executed a voluntary general surrender of his parental rights to David on May 7, 2021.

In June 2022, the trial court changed the permanency plan from KLG to termination of Theresa's parental rights. A nine-day trial proceeded, and on July 7, 2023, Judge Marley rendered a thorough oral decision, finding DCPP had presented clear and convincing evidence of all four prongs of N.J.S.A. 30:4C-15.1(a), and issued an order terminating Theresa's parental rights. This appeal followed.

II.

Our "scope of review on appeals from orders terminating parental rights is limited." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 256 (App. Div. 2019). We review the trial court's factual findings "in accordance with a deferential standard," N.J. Div. of Child. Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023), and its findings "generally should be upheld so long as they are supported by 'adequate, substantial, and credible evidence,'" M.M., 459 N.J. Super. at 256 (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We defer to the factual findings of the family court due to that court's special expertise in family matters and the inadequacies of a cold record. See N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "We will not overturn a family court's fact findings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice."

6

Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)) (internal quotation marks omitted).

We address only prongs two and three in these additional comments and rely upon Judge Marley's findings and legal conclusions regarding all four prongs.

A. Prong Two:  Whether the Parent has Ameliorated the Conditions that Led to the Child's Removal.

DCPP must prove by clear and convincing evidence "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm."  N.J.S.A. 30:4C-15.1(a)(2).  Harm may be established by a parent's incapacity due to mental illness.  See N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 439-40 (App. Div. 2001) (finding the first prong of N.J.S.A. 30:4C-15.1(a) was satisfied because the biological parents "suffer[ed] from mental disorders which adversely affect[ed] their ability to parent" and "[d]espite [their] good intentions . . . there was just no evidence in the record to show that either parent . . . would have the mental status sufficient to eliminate the risk of future harm to the child").

Although "[m]ental illness, alone, does not disqualify a parent from raising a child," "if a parent refuses to treat [the] mental illness, the mental

A-3644-22

illness poses a real threat to a child, and the other parent . . . is unwilling or incapable of following court orders to shield [the] child from that danger," prong two of N.J.S.A. 30:4C-15.1(a) will be satisfied. F.M., 211 N.J. at 450-51. Harm can also be established through a parent's incapacity due to substance abuse. See N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 221-22 (App. Div. 2013) ("[a]lthough drug use alone is not enough to show harm . . . . [h]ere, harm and risk of harm were proven because the parents' drug use resulted in their failure to provide a stable home, with appropriate nurture and care of the young child"); N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 113 (App. Div. 2021).

Here, the trial court adequately assessed the evidence to determine whether Theresa had been sufficiently able to ameliorate the risk of harm to David and, if unremedied, whether the delay needed to address and lessen that risk will cause additional harm to him. The court concluded that although Theresa had attended therapy consistently and complied with her medication regime for over four years during this litigation, she still posed a risk of harm to David that could not be ameliorated in the foreseeable future. In doing so, the trial court relied on the Division's expert witness, who had completed psychological evaluations of Theresa and bonding evaluations of Theresa and

David, and had testified credibly at trial that Theresa lacked minimum insight into her mental-health conditions, the need to comply with medication monitoring, and the effect that substance abuse had on her mental-health diagnoses and ability to parent David. Theresa's use of alcohol, marijuana, and PCP over two years after David had been in DCPP's custody, and after she was advised of the need to remain substance-free to prevent the worsening of her schizophrenia symptoms, support the trial court's determination that Theresa has been unable to ameliorate the conditions that led to David's removal and was unlikely to do so in the foreseeable future.

Although it is clear to us that Theresa shows a great desire to parent her child, we agree with the trial court's conclusion that DCPP "me[t] the clear and convincing standard that [Theresa] has been unwilling or unable to improve her mental health or behavioral challenges such that she might be able to parent her child adequately and safely."

B. <u>Prong Three: Whether DCPP and the Trial Court Considered Viable Alternatives to Termination.</u>

Pursuant to the third prong of N.J.S.A. 30:4C-15.1(a), DCPP must demonstrate it has attempted alternatives to termination of parental rights in its proposed permanent placement of a child. N.J.S.A. 30:4C-15.1(a)(3).

Pursuant to N.J.S.A. 30:4C-15.1(a)(3), "KLG is considered an alternative to termination of parental rights that offers permanency and stability to a child residing with a relative or kinship caregiver." N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 82-83 (App. Div. 2023). "The decision of a resource parent to choose adoption over KLG must be an informed one," M.M., 459 N.J. Super. at 260, and must be "unconditional, unambiguous, and unqualified." Id. at 264. However, once the caregiver is provided information regarding the benefits and burdens of a KLG, the caretaker's preference between the two alternatives "should matter." Id. at 263.

When DCPP first obtained custody of David in 2019, it reached out to relatives identified by Theresa and assessed them to determine if any of them could care for David. It also considered relatives who had contacted DCPP and indicated they were interested in caring for the child. L.B. and R.W., who expressed interest in caring for David as kinship legal guardians later in May 2022, were initially identified by Theresa but ruled out in January 2019 due to concerns raised in their respective background checks. Although those circumstances had changed by 2022, and the background checks would not have precluded David's placement with either of them at that time, DCPP declined to place David with either of them in 2022 due to the length of time David had

been in his current, stable, and pre-adoptive placement. DCPP may rule out relative caregivers based on the best interests of the child. See N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 85 (App. Div. 2013) ("We therefore perceive no dissonance between the Division's ability to rule out a relative as a caretaker purely on a 'best interests' assessment [pursuant to] N.J.S.A. 30:4C-12.1, and the overarching four-pronged statutory test of termination under N.J.S.A. 30:4C-15.1(a)."). The trial court properly found L.B. and R.W.'s belated interest in KLG with David in 2022 was not a viable alternative to termination because they had been ruled out in 2019, they made no effort in the interim to establish a relationship with the child, and it was not in David's best interest to remove him at that time from his stable placement.

In addition, the trial court evaluated DCPP's efforts to encourage KLG with Tara and Robert, who after multiple conversations with DCPP, refused a KLG arrangement. Theresa insists the trial court erred because it allowed the resource parents to "veto an otherwise viable KLG arrangement." However, neither DCPP nor the trial court may force a resource parent or relative to become a kinship legal guardian. See D.C.A., 256 N.J. at 24 n.8 ("When a court orders KLG, the child is placed with a caregiver with whom the child has a kinship relationship and 'who is willing to assume care of a child due to parental

11

incapacity, with the intent to raise the child to adulthood.'" (quoting N.J.S.A. 3B:12A-2)).

Judge Marley reviewed all of the evidence presented at trial, made specific factual findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded DCPP had established, by clear and convincing evidence, all the legal requirements necessary to terminate Theresa's parental rights. Judge Marley's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a), accords with our well-established case law on the matter, and is amply supported by the record. As such, her conclusions are unassailable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3644-22