# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4452-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

R.P.,

    Defendant-Appellant,

and

S.M. and C.P.,

    Defendants.

_____

IN THE KINSHIP MATTER OF
K.M. and B.P.,

    Minors.

_____

Submitted November 12, 2019 – Decided November 27, 2019

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket Nos. FL-14-0008-18 and FL-14-0009-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Phuong Vinh Dao, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Ashley L. Kolata-Guzik, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor B.P. (Rachel E. Seidman, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant R.P. (Robert) appeals from a May 14, 2018 order granting Kinship Legal Guardianship (KLG) of his then six-year-old daughter, B.P. (Becky), to her maternal great uncle, C.M.[1] We affirm.

I.

We summarize the pertinent facts from the record. Defendant S.M. (Susan) is the biological mother of Becky, born in February 2012, and K.M. (Kelly), born in July 2006 (collectively, the girls). Robert is the biological father

---

[1] We identify the parties and children by initials and pseudonyms to protect their privacy pursuant to Rule 1:38-3(d)(12) and N.J.S.A. 9:6-8.10.

of Becky. C.P. (Charlie) is the biological father of Kelly. Both girls were solely parented by Susan until removed by the Division of Child Protection and Permanency (the Division) and placed with resource parents, the children's maternal great grandmother and maternal great uncle, C.M (the M's). Susan lived with the girls in the residence of the resource parents until March 2016. Susan voluntarily stipulated to KLG with C.M. on the first day of trial.

The trial took place on April 30, 2018. Charlie did not appear for trial but was represented by counsel. Neither Susan nor Charlie appeal from the trial court's orders. We therefore limit our discussion to Becky.

We summarize the trial court's findings of fact. Permanency caseworker Leena George provided the following testimony on behalf of the Division. She was assigned to this family in 2016 and testified as custodian of the Division's records. The trial court found her testimony credible.

Susan became involved with the Division in 2007 due to her mental health and substance abuse issues. Robert had minimal involvement with his daughter and the Division throughout that time period.

In February 2016, the Division received a referral regarding Susan as a result of her arrest for distribution of heroin. The Division interviewed Robert, who offered to care for Becky and Kelly. "At that time, Robert's visits with

Becky were sporadic." He reported "his plan was to leave Becky in the primary care of her great grandmother and great uncle," while making himself available "'on a daily basis' as necessary until he developed a stronger bond with her." The Division experienced difficulty maintaining contact with Robert because he did not return phone calls or respond to correspondence. At one point, Robert did not visit Becky for over a month. "When his visitation with Becky was liberal and unsupervised, he visited with her randomly and sporadically."

The Division obtained psychological and psychiatric evaluations of Robert and referred him to parenting classes. It also provided medication and individual therapy. Robert frequently failed to comply with those services, did not attend monthly meetings with the caseworker, and failed to make weekly calls to the caseworker.

Robert falsely reported the results of Becky's dental examination to the Division, claiming she was fine and needed no additional treatment, when she actually needed significant follow up treatment.

Susan was provided with substance abuse evaluations and treatment, visitation, assessments, and family team meetings.

A-4452-17T3

George reported the resource parents had a strong preference for KLG and did not wish to adopt. Both indicated they would allow visitation between Robert and Becky.

In June 2016, the Center for Evaluation and Counseling (CEC) met with the family members and conducted a forensic clinical evaluation. Charlie told the evaluator that Susan "popped pills," attended a methadone clinic, and had overdosed more than once.

During his interview, Robert reported he was on disability from the military and attended Sussex County Community School. He admitted being aware of Susan's drug use and voiced concerns for Becky while in Susan's care. He acknowledged he did not advise the Division of these concerns and did not initially seek custody of Becky. Robert told CEC he wanted full custody of Becky because the Veteran's Administration would give him $2100 per month for food and clothing for Becky. "He stated he believe[d] Becky was too young to have been impacted by his lack of involvement in her life prior to age three."

Robert reported he was never deployed while in the military, "but spoke of traumatic incidents as if he experienced combat." He told CEC "he experienced blackouts, flashbacks and nightmares." He stated he was bitten by a brown recluse spider and suffered "a coma and brain damage that caused tics,

A-4452-17T3

convulsions, and memory deficits." He also reported experiencing paranoid symptoms and was prescribed psychotropic medication, which he did not take because "it makes him feel like a 'zombie.'" Robert acknowledged engaging in a physical altercation with his then girlfriend. He subsequently married a different woman.

Finally, George testified that when the Division became involved as a result of the altercation incident, Robert reported a history of post-traumatic stress disorder (PTSD) and bipolar disorder. "The Division offered him psychological and psychiatric evaluations, individual therapy, medication monitoring and three Family Team Meetings, of which he attended one." Robert was allowed weekly supervised visits with Becky due to his disclosures about his behavior.

Dr. Jack Yoeman testified on behalf of the Division. He was qualified as an expert in the fields of psychology, risk assessment, bonding, and parenting. "The court found him generally credible" but noted his heavy reliance on his report for details about the case. Dr. Yoeman interviewed Robert and his wife, conducted a bonding evaluation between Robert and Becky, and a bonding evaluation between the resource parents, Becky, and Kelly.

"Dr. Yoeman concluded Robert has a fairly extensive history of mental health issues, including [PTSD], short-term memory loss, anxiety, depression, and a historical diagnosis of bipolar disorder." Robert reported he does not need treatment but is willing to take medication, although he does not believe he needs any. Dr. Yoeman found Robert minimizes his mental health history.

Dr. Yoeman opined Robert is unable to provide a safe and stable home for Becky in the foreseeable future because of his inconsistent participation in mental health treatment and his lack of insight regarding his mental illness, which in turn impacts his parenting ability. Dr. Yoeman expressed concern that Robert would be unable to cooperate with Becky's treatment providers and educators, and would not be protective of her. He found Robert's wife also failed to appreciate the extent of Robert's mental illness.

The trial court noted that unlike in termination cases, a bonding analysis is not a component in KLG matters. Even so, Dr. Yoeman testified about the lack of bonding between Robert and Becky. In contrast, he found a "strong, psychological, healthy bond between Becky and her resource parents." He opined Becky would experience no harm if KLG were granted but substantial harm would occur if Becky were removed from her resource parents. Dr.

A-4452-17T3

Yoeman further opined that Robert would be unable to mitigate the "harm caused by removal because of his lack of insight into his own mental health."

Robert did not testify during the trial or present any expert testimony. The trial court noted he "appears sincere in his desire to parent Becky but does demonstrate a lack of insight into his basic functioning and his own needs."

Based on those findings, the trial court reasoned:

> It is evident to the court Robert loves Becky very much and desires to parent her. However, Robert, although available and willing, is not capable of providing for Becky's basic needs. The uncontroverted expert testimony, as well as the Division's exhaustive record, amply demonstrates by clear and convincing evidence Robert's lack of insight into his mental illness, his refusal to take medication consistently, and the impact of his mental illness on his parenting render him unable to perform the regular and expected functions of care and support. The court has given considerable weight to Dr. Yoeman's psychological observations of Robert and his opinions regarding Robert's mental health, which were not challenged by any other expert.
>
> Robert has never parented Becky or any other child. Through no fault of his own, he was unable to parent her initially because he was serving our country until he was discharged from the service when Becky was three years old. However, thereafter, he left Becky in the care of Susan, willfully, and knowing of Susan's drug use and neglect of Becky. He took no steps to assume care of Becky. Throughout the Division's involvement, he was non-compliant with therapy and medication monitoring, and inconsistent with visitation and communication with the Division. He has had two

A-4452-17T3

years to address his mental illness but demonstrates a significant lack of insight into the severity of his mental health issues, despite occasional treatment, and demonstrates clearly and convincingly his inability to perform basic parenting functions is unlikely to change in the foreseeable future. The court has relied mostly on his own statements made to the Division and CEC in determining he lacks sufficient insight into his mental illness and exhibits poor judgement. Defense counsel's argument, that the Division's services did not meet ADA accommodations, is without merit. Robert was being treated at a VA hospital but refused to follow its recommendations and take medication. The Division provided reasonable services, which Robert refused. A parent's refusal to comply with mental health services provides a poor prognosis for future change because a recognition there is a mental illness is necessary for interventions to work.

. . . .

Becky and Kelly have lived with the M's their entire life. They have been primarily parented by the M's even when Susan lived with them, a fact acknowledged by Robert in his interview with CEC. The Division's plan is for both girls to live together where they have always lived, and be cared for by the people who have cared for them since their births. The Division has proven the kinship legal guardians have no desire to adopt.

The trial court concluded: (1) the Division exercised reasonable efforts to reunify Becky with her birth parents; (2) the reunification efforts were unsuccessful; and (3) adoption is neither feasible nor likely. The court found there was clear and convincing evidence that KLG was in the best interests of

9

both children and granted KLG of Becky to C.M.  The court also ordered that visitation of Becky by Robert "shall be at the discretion of the kinship legal guardian."  This appeal followed.

The Law Guardian urges this court to affirm the trial court's order granting KLG.

Robert raises the following points on appeal:

> (1) THE TRIAL COURT ERRED IN FINDING THAT DCPP PROVED BY CLEAR AND CONVINCING EVIDENCE THAT ROBERT WAS UNABLE OR UNWILLING TO PROVIDE FOR BECKY'S BASIC NEEDS.
>
> (2) THE TRIAL COURT ERRED IN FINDING THAT DCPP PROVED BY CLEAR AND CONVINCING EVIDENCE THAT ROBERT'S INABILITY TO CHANGE IN THE FORESEEABLE FUTURE.
>
> (3) THE TRIAL COURT ERRED IN FINDING THAT DCPP PROVED BY CLEAR AND CONVINCING EVIDENCE THAT IT PROVIDED REASONABLE EFFORTS TO REUNIFY BECKY WITH ROBERT.
>
> (4) KINSHIP LEGAL GUARDIANSHIP WITH THE MATERNAL FAMILY IS NOT IN BECKY'S INTEREST.

II.

Appellate "[r]eview of a trial court's grant of guardianship is limited." N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 210 (App. Div.

2007) (citing <u>N.J. Div. of Youth & Family Servs. v. M.M.</u>, 189 N.J. 261, 278 (2007)). "We will not disturb the factual findings of the trial judge unless they are unsupported by adequate, substantial and credible evidence in the record." <u>Ibid.</u> (citing <u>M.M.</u>, 189 N.J. at 279). "'Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility' because the trial court has the benefit of seeing and hearing the witnesses and determining whether they are believable." <u>Ibid.</u> (quoting <u>N.J. Div. of Youth & Family Servs. v. C.S.</u>, 367 N.J. Super. 76, 112 (App. Div. 2004)); <u>see also</u> <u>Cesare v. Cesare</u>, 154 N.J. 394, 411-12 (1998) ("The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." (citing <u>Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am.</u>, 65 N.J. 474, 484 (1974))).

Parents enjoy a constitutionally protected right to the care, custody and control of their children. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753 (1982); <u>In re Guardianship of K.H.O.</u>, 161 N.J. 337, 346 (1999). "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . .,' and 'rights far more precious . . . than property rights.'" <u>Stanley v. Illinois</u>, 405 U.S. 645, 651 (1972) (alteration in original) (citations omitted). "[T]he preservation and strengthening of family life is a matter of public concern as being in the

interests of the general welfare." N.J.S.A. 30:4C-1(a); see also K.H.O., 161 N.J. at 347 (discussing N.J.S.A. 30:4C-1(a)). The constitutional right to the parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986).

KLG is an alternative to termination of parental rights. N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 259 (App. Div. 2019). The Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to -7, was enacted because "an increasing number of children who cannot safely reside with their parents are in the care of a relative or a family friend who does not wish to adopt the child or children." N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 222-23 (2010) (citing N.J.S.A. 3B:12A-1(a) to (b)). KLG was established "as an alternative permanent placement option without the need for termination of parental rights and 'where adoption is neither feasible nor likely.'" Id. at 223 (quoting N.J.S.A. 3B:12A-1(c)). The child's parents "retain the right to visitation or parenting time with the child, as determined by the court." N.J.S.A. 3B:12A-4(a)(4).

To grant KLG, the court must find by clear and convincing evidence that:

> (1) each parent's incapacity is of such a serious nature
> as to demonstrate that the parents are unable,

unavailable or unwilling to perform the regular and expected functions of care and support of the child;

(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;

(3) in cases in which the [D]ivision is involved with the child as provided in [N.J.S.A. 30:4C-85], (a) the [D]ivision exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and

(4) awarding kinship legal guardianship is in the child's best interests.

[N.J.S.A. 3B:12A-6(d).]

### III.

Defendant argues the trial court erred by finding the Division satisfied its burden under each of the four prongs of N.J.S.A. 3B:12A-6(d). Defendant contends the evidence was insufficient to support the court's conclusion that the Division clearly and convincingly established those prongs under the statutory standard. We disagree and affirm substantially for the reasons expressed by Judge Maritza Berdote Byrne in her cogent written opinion. We add the following comments.

The record fully supports the trial court's findings that the evidence clearly and convincingly established: (1) Robert's incapacity is of such a serious nature

as to demonstrate he is unable, unavailable, or unwilling to perform the regular and expected functions of care and support of Becky; (2) Robert's inability to perform those functions is unlikely to change in the foreseeable future; (3) the Division made reasonable efforts to reunify Becky with Susan and Robert; and (4) KLG was in Becky's best interest because she was bonded to C.M. and should remain in his care.

In sum, we are convinced that the trial court's findings under all four prongs of N.J.S.A. 3B:12A-6(d) are supported by adequate, substantial evidence that the court found credible. We therefore uphold the court's order awarding KLG of Becky to C.M.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4452-17T3