# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2639-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.M.

     Defendant-Appellant,

and

R.C.

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.M.,
a minor.

_____

Submitted October 14, 2021 – Decided November 22, 2021

Before Judges Gilson and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0157-19.

Joseph E. Krakora, Public Defender, attorney for appellant (James D. O'Kelly, Designated Counsel, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Meaghan Goulding, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Louise M. Cho, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.M. (Melanie)[1] appeals from the final judgment of the Family Part terminating her parental rights to her biological daughter M.M. (Mary) and the denial of her subsequent motion to vacate the judgment due to purportedly changed circumstances, specifically her mother's decision not to adopt Mary and the willingness of a great aunt to be assessed as a potential placement.[2] After

---

[1] We use fictitious names and initials for ease of reading and to protect the identities of the parties. R. 1:38-3(d)(12).

[2] Mary's biological father, R.C. (Robert), is not a party to this appeal.

2

A-2639-19

reviewing the record developed at trial and mindful of our standard of review, we affirm.

I.

The Division of Child Protection and Permanency (the Division) first had contact with Melanie when it received a referral in 2014 alleging Melanie and her then-boyfriend were engaging in drug use while caring for her first biological daughter, M.M. (Michelle). The Division eventually found the allegations of abuse unsubstantiated. A court subsequently awarded Michelle's father sole legal and physical custody of Michelle.

A.

On May 3, 2018, the Division received a referral from a hospital social worker alleging Melanie, who was then thirty-four weeks pregnant, had come to the emergency room for the fourth time during her pregnancy, complaining of "vomiting, indigestion, fever, and chills" and testing positive for phencyclidines (PCP). The social worker described Melanie as "appear[ing] to have significant mental health issues as a result of long-term abuse of the drug." Four weeks later, Melanie gave birth to Mary. When both Melanie and Mary tested positive for PCP, hospital staff contacted the Division. The Division interviewed Melanie at the hospital. She was jittery and unfocused and admitted she had

3

smoked PCP during the last month. Mary "present[ed] with withdrawal symptoms," including increased sucking, crying, and tremors, and was treated with morphine. Mary was discharged from the hospital two and a half weeks after her birth and was placed in a resource home.

Two days after Mary's discharge, Melanie executed an agreement with the Division, in which she consented to completing a substance-abuse evaluation. After missing the first five scheduled substance-abuse evaluations, Melanie participated in an evaluation on September 14, 2018. The evaluator concluded Melanie needed treatment. Melanie agreed to participate in an outpatient program with Airmid Counseling Services ("Airmid"). A positive PCP test would result in "a mandatory referral for residential treatment." Melanie's initial test was positive for PCP. She successfully completed a thirty-day, inpatient detoxification program at a facility called Turning Point. Turning Point recommended Melanie, after completing its thirty-day program, attend a "Mommy and Me" program, which provides housing and parenting classes to new mothers with substance-abuse issues, enabling them to work on those issues in a "24-hour structured environment." Melanie declined to participate in that program, stating she had received a housing voucher and wanted to get an apartment. Melanie returned to Airmid for outpatient counseling but tested

4

positive for PCP the day she was discharged from the detoxification program and in eight tests conducted over the next two months, even though the Division had told her a positive test would result in a referral for long-term residential treatment.

After testing positive for PCP through December 2018, Melanie was referred to a long-term residential treatment facility but declined to attend, again stating she needed to secure housing before attending any residential treatment program. For months Melanie continued to test positive for PCP and to reject the Division's repeated recommendations she enter a detoxification program followed by a long-term treatment program for her PCP use. In April and May 2019, she returned to Turning Point for detoxification but left both times before completing the program, against medical advice. In June, she entered a short-term residential program at another facility but left after only two days. She continued to test positive for PCP in April, May, and June but insisted she would participate only in an outpatient program.

In the year following Mary's birth, while the Division was working with Melanie to have her agree to enter an inpatient treatment program so that she could address her substance-abuse issues and be reunited with Mary, Mary continued to reside with the resource family. The Division facilitated supervised

visits between Melanie and Mary, asked Melanie and Robert to identify any relatives or friends who would be willing to provide care to Mary, and explored several possible relative placements for Mary. Mary was not placed with those relatives because they were either unwilling or deemed unable to care for her.

Gina, Mary's maternal grandmother, initially told the Division she did not want to be considered as a potential caregiver for Mary because she had a busy work and school schedule. In a September 7, 2018 letter, the Division confirmed that information and told Gina she could ask to be reconsidered if she had a change of circumstances. Gina also was concerned that if she accepted placement, Melanie would not take the necessary steps for reunification. After time had passed with insufficient progress, Gina decided to rearrange her schedule so she could care for Mary. In a June 10, 2019 letter, Gina confirmed she wanted to adopt Mary. A Division worker assessed her home and placed Mary with Gina on June 21, 2019. One of her original resource parents told a Division caseworker her family loved Mary and would "love" to have her returned to them if her placement with Gina was unsuccessful.

In a June 11, 2019 order, the trial judge approved the Division's decision to change Mary's goal from reunification to termination of parental rights followed by adoption. The judge found Melanie had been non-compliant with

A-2639-19

multiple inpatient substance-abuse programs "despite consistently testing positive for PCP," had "refused to remain in inpatient treatment for any significant length of time," had "left multiple inpatient programs against medical advice," and had requested outpatient treatment "despite clear recommendations that she must attend an inpatient program." The Division filed the complaint in this action on June 27, 2019.

Before trial, Robert executed a document voluntarily surrendering his parental rights to Gina. At a November 20, 2019 hearing, conducted by the same judge who presided over the trial, Robert confirmed under oath his intention to surrender his parental rights to Gina. Gina attended that hearing and stated under oath, "I would like to adopt [Mary]."

B.

The trial judge began a three-day trial on January 6, 2020. A Division caseworker testified about the services the Division had provided to Melanie since Mary's birth, the repeated recommendations for inpatient treatment and Melanie's failure to comply, Melanie's numerous positive tests for PCP, and Gina's intention to adopt Mary. Another Division employee testified Gina wanted to adopt Mary and that Gina had submitted to the Division a signed "Acknowledgement of Receipt of Adoption/KLG Fact Sheet," stating she had

7

received a copy of the "Fact Sheet of Differences between Adoption and Kinship Legal Guardianship" and had discussed those differences with a Division employee.

Melanie objected to the admission into evidence of Gina's June 10, 2019 letter about her desire to adopt Mary, arguing it was inadmissible third-party hearsay. The trial judge held the letter was admissible pursuant to N.J.R.E. 803(c)(3) for the limited purpose of expressing Gina's intent to adopt Mary and would not be considered for any other purpose.

Psychologist Elizabeth Stilwell testified Melanie was "not capable of . . . independently caring for her daughter now or in the foreseeable future." She stated Melanie's parenting-capacity prognosis was poor due to her chronic PCP use and longstanding behaviors, including lack of impulse control, mood lability, aggressiveness, treatment resistance, and difficulty remaining in contact with reality. Dr. Stilwell also opined Melanie's prognosis for maintaining sobriety was poor and that even though "at some level, [Melanie] knows what it is that she needs to do in order to be reunified with her children . . . she has repeatedly demonstrated that she's unable to do that." Dr. Stilwell concluded Mary would be at risk if she were reunited with Melanie due to Melanie's prolonged instability, lack of behavioral and impulse control, and poor executive

functioning and decision-making. Conversely, she did not "expect to see a significant disruption in [Mary], should [Melanie's] parental rights be terminated." According to Dr. Stilwell, Mary did not see Melanie as a "primary attachment figure." Overall, Dr. Stilwell believed termination of Melanie's parental rights would not do more harm than good, noting "[t]ermination of parental rights would afford [Mary] the opportunity to achieve permanency, and that permanency being through adoption by her maternal grandmother."

In addition to her testimony, Dr. Stilwell's written evaluation was admitted into evidence with no objection from Melanie. The evaluation included information regarding Dr. Stilwell's December 6, 2019 interview with Gina. According to Dr. Stilwell, Gina "reported that she is interested in adopting [Mary] if she should become legally free."

In her closing argument, Melanie's counsel argued, among other things, the Division had not established it had considered alternatives to termination of parental rights, such as kinship legal guardianship (KLG). Counsel for the Division pointed out Melanie had not raised the KLG issue until her counsel's closing argument and asserted the trial judge should reject that last-minute contention when the record was clear Gina had been advised of the KLG option but intended to adopt Mary. Mary's law guardian supported the termination of

Melanie's parental rights, arguing, among other things, the record contained no evidence to support KLG was in Mary's best interest.

On February 11, 2020, the trial judge issued an oral decision and a comprehensive written opinion and order, holding the Division had proven by clear and convincing evidence all four prongs of the statutory best-interests-of-the-child test, N.J.S.A. 30:4C-15.1(a), and terminating Melanie's parental rights. In reaching her conclusion, the trial judge cited Melanie's continued PCP use, the Division's continuous efforts to provide her with treatment services, Melanie's repeated noncompliance with the offered services, and the testimony of the Division's witnesses, whom the trial judge found to be credible. Recognizing a court must consider alternatives to termination of parental rights, the trial judge found the Division had "explored relative placement[] options" and tailored its efforts "to the needs of [Melanie] in order to reunify [Mary] with her," but "[t]o this day, [Melanie] has not remediated the circumstances that resulted in [Mary's] removal and continues to test positive for PCP."

After Melanie appealed that decision, the Division, at Gina's request, removed Mary from Gina's home and placed her in the care of her former non-relative resource parents, who are now committed to adopting Mary. We granted Melanie's subsequent motion for a remand for the limited purpose of allowing

A-2639-19

Melanie to file with the trial court a <u>Rule</u> 4:50 motion, seeking to vacate the judgment terminating her parental rights. In her vacation motion, Melanie argued Mary's placement change and the existence of another potential relative resource (Mary's maternal great aunt) constituted changed circumstances that rendered inequitable the continued enforcement of the judgment terminating her parental rights. Melanie contended it would be in Mary's best interest to vacate the judgment and have the Division assess Mary's great aunt as a potential relative placement.

After hearing oral argument, the trial judge on August 26, 2020, issued an order and written opinion denying Melanie's motion, finding she had "not present[ed] any changed circumstances as to herself and [had] not present[ed] any evidence that the circumstances that caused [Mary's] removal [had] been remediated." The judge considered the resource parents' commitment to adopting Mary and that Mary had lived with them from her hospital release after birth until her placement with Gina. In comparison, the great aunt had not asserted an "unequivocal intent to adopt" Mary, only a "mere willingness to be assessed," and Melanie previously had not offered the great aunt as a potential placement. Recognizing placement with a relative is preferred but not required, the judge held "[t]o prolong litigation in order for the Division to explore the

great aunt at this juncture would only impede [Mary's] already set path to permanency." Acknowledging Dr. Stilwell's testimony that Mary would experience "significant disruption" if removed from Gina, the judge also referenced Dr. Stilwell's testimony that Mary would not experience significant harm from terminating the relationship with Melanie and found Melanie's "continued unfitness to parent is at issue, regardless of the attachment [Mary] may have had" with Gina. Denying the motion, the judge concluded Melanie "continues to be an unfit parent and [Mary's] need for permanency and stability remains paramount."

Mary amended her notice of appeal to include the denial of her vacation motion.

II.

We review a judgment of termination of parental rights mindful that we are bound to uphold the Family Part judge's factual findings if they are supported by "adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998); see also N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 256 (App. Div. 2019). Our Supreme Court adopted that deferential standard of review because Family Part judges are presumed to have a "specialized knowledge and experience in matters involving parental

12

relationships and the best interests of children."  N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012).  We are bound to defer to the trial court's credibility determinations also because the trial judge's proximity to the litigants provides "a 'feel of the case' that can never be realized by a review of the cold record."  N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).  We review de novo a trial court's legal conclusions.  N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014).

## A.

N.J.S.A. 30:4C-15.1(a) states:

> The [D]ivision shall initiate a petition to terminate parental rights on the grounds of the "best interests of the child" pursuant to . . . [N.J.S.A.] 30:4C-15 if the following standards are met:
>
> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and

the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See N.J. Div. of Child Prot. & Perm. v. T.S., 463 N.J. Super. 142, 163 (App. Div. 2020) (holding Family Part's determination of parental capacity must "be guided by the four-prong standard codified in N.J.S.A. 30:4C-15.1(a)"). In this appeal, Melanie challenges only the trial judge's findings that the Division established the second part of the third prong and the fourth prong. Melanie also contends the trial court erred in finding Gina's letter was admissible under N.J.R.E. 803(c)(3) and in denying her motion to vacate the judgment.

Relying on M.M, 459 N.J. Super. 246, Melanie bases much of her argument on the trial judge's purported error in not exploring or articulating whether Gina could have or would have served as a kinship legal guardian instead of an adoptive mother. That argument is rendered moot by the undisputed fact that after the trial, Gina asked the Division to remove Mary from her home. Debating now whether more could have or should have been said or done concerning Gina serving as a kinship legal guardian would ignore the reality of Mary's life now: Gina does not want to care for Mary or have her in

her home; Mary is with people who cared for her in the first year of her life and are committed to caring for her as adoptive parents for the rest of her life.

This case is not M.M. In M.M., we were unable to affirm the trial court's finding as to the third statutory prong "because the factual record, which [was] based upon a series of somewhat inconsistent and conditional hearsay statements, [was] insufficiently clear with respect to issues concerning adoption and the potential alternative of KLG." Id. at 257. The record in M.M. contained references to multiple statements by the resource parents indicating they were willing to adopt but would consider or even prefer KLG. Id. at 266-70; see also id. at 273 (referencing the resource parents' "equivocal and ambiguous hearsay statements"). "Viewing all of these bits of hearsay in their totality," we could not determine whether the resource parents were committed to adoption, "regardless of the possible alternative of KLG." Id. at 273.

In contrast, the record before us in this case is clear and consistent. The documentary evidence – Gina's letter, her executed "Acknowledgement of Receipt of Adoption/KLG Fact Sheet," and Dr. Stilwell's report – demonstrates Gina's intent to adopt and that her intent was an informed one. See id. at 260 (finding "decision of a resource parent to choose adoption over KLG must be an informed one"). The testimony of both Division employees likewise established

Gina's intent to adopt and that she formed that intention having been provided information regarding KLG as a viable alternative. This record is devoid of any evidence Gina would have considered KLG in lieu of adoption. Unlike the M.M. trial judge, who was faced with a "muddy" record full of contradictory statements, id. at 265, the only evidence before this trial judge was: having been informed of the KLG option and the differences between adoption and KLG, Gina intended to adopt. A finding of KLG by this judge would have been factually and legally unsupported. See N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007) (holding KLG is a viable alternative "when adoption is neither feasible nor likely").

Melanie faults the trial judge for admitting into evidence over her objection Gina's letter for the limited purpose of expressing Gina's intent to adopt Mary. We have recognized that the circumstance of communications by and with resource parents being all hearsay statements is not unusual in guardianship litigation. M.M., 459 N.J. Super. at 266. In M.M., we declined to address the appropriateness of the trial court considering hearsay statements attributed to the resource parents. Noting "counsel did not consistently oppose the admission of such hearsay," id. at 276, we held "[h]earsay subject to a well-founded objection is generally evidential if no objection is made" and "[w]hen

16

objectionable hearsay is admitted in a bench trial without objection, we presume that the fact-finder appreciates the potential weakness of such proofs, and takes that into account in weighing the evidence."  Ibid. (quoting N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 348-49 (App. Div. 2016)).

Similarly, here, Melanie at trial did not object to the admission into evidence the executed "Acknowledgement of Receipt of Adoption/KLG Fact Sheet," Dr. Stilwell's evaluations, or the testimony of the Division workers regarding Gina's submission of that executed form or her intent to adopt.  By not objecting, Melanie invited error and "deprived the Division of the opportunity to overcome any objection."  N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 341 (2010).  Melanie's counsel's decision not to object to those other documents and the Division employees' testimony may have been strategic given Gina's possible testimony about Melanie.  See id. at 342 ("Particularly where defense counsel may have made a strategic decision to try the case based on the documents, instead of possibly facing a witness's direct testimony, it would be unfair to the Division to reverse on this issue.").  According to Dr. Stilwell, Gina told her Melanie could not care for Mary because of her addiction to illicit substances and when she asked Gina about allowing Melanie to have contact with Mary after she was adopted, Gina responded:  "I am thinking about it.  I

am not sure if she will be able to visit if she doesn't behave. She will kick the door and pushed my neighbor down to get to me. I gave her one more chance. She knows if she messes up then that is it." That statement, made only one month prior to trial, does not demonstrate an interest in KLG; it demonstrates the opposite. Even if admission of the letter was error, it does not warrant reversal given the other evidence before the court.

We recognize the better course would have been for the trial judge to articulate expressly her consideration of the KLG alternative in her opinion. That she did not expressly address it is not reversible error. Again, this case is not M.M. In M.M., we faulted the trial judge for not "explain[ing] or reconcil[ing] the vacillating and ambiguous statements" of the resource parents. 459 N.J. Super. at 275. Here, with a consistent and clear record, the trial judge had nothing to reconcile. Recognizing she had to consider "alternatives to termination of parental rights" and finding the Division had "explored relative placement options," the trial judge concluded the Division had established the third statutory prong by clear and convincing evidence. We see no reason to disturb that conclusion. And we see no reason to disturb the judge's findings regarding the fourth prong, which were supported by adequate and substantial

credible evidence in the record. Accordingly, we affirm the final judgment terminating Melanie's parental rights to Mary.

B.

We affirm the denial of Melanie's vacation motion substantially for the reasons set forth in the trial judge's comprehensive, written decision. To vacate a judgment terminating parental rights, a party must establish (1) changed circumstances that justify vacating the judgment and (2) vacating the judgment is in the child's best interest. In re Guardianship of J.N.H., 172 N.J. 440, 473-75 (2002); N.J. Div. of Youth & Fam. Servs. v. T.G., 414 N.J. Super. 423, 434-35 (App. Div. 2010). As the trial judge found, the great aunt's mere willingness to be assessed and Gina's decision not to adopt do not constitute changed circumstances that justify vacating the judgment given Mary's long-time resource parents' undisputed commitment to adopt her and Melanie's failure to present evidence regarding a change in her unfitness to parent. The trial judge correctly held Mary's "need for permanency and stability remain paramount," see J.N.H., 172 N.J. at 475, and that Melanie had not established vacation of the judgment was in Mary's best interest.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2639-19