# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2229-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.W.,

     Defendant,

and

R.B.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
H.N.B., a minor.

_____

Argued January 14, 2026 – Decided February 9, 2026

Before Judges Mayer, Gummer and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, FG-07-0062-22.

Meghan K. Gulczynski, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Meghan K. Gulczynski, on the briefs).

Renee Greenberg, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Renee Greenberg, on the brief).

David B. Valentin, Assistant Deputy Public Defender, argued the cause for minor (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, of counsel and on the brief).

PER CURIAM

Defendant R.B. (Robert) appeals from a March 7, 2025 judgment of guardianship terminating his parental rights to his son, H.N.B. (Harry).[1] Robert contends the Division of Child Protection and Permanency (Division) failed to prove all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Division and Harry's Law Guardian support the entry of the judgment.

---

[1] We use initials and pseudonyms in this opinion to protect the parties' privacy. R. 1:38-3(d)(12).

We are satisfied the judge's decision that the Division had met its burden of proving all four prongs of the statutory criteria under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence is well-supported by the record. Thus, we affirm the decision to terminate Robert's parental rights, substantially for the reasons expressed by Judge Nora J. Grimbergen in her thirty-three-page comprehensive written decision.

## I.

We need not recite in detail the history of the Division's interactions with Robert. Instead, we incorporate by reference the thorough factual findings and procedural history contained in Judge Grimbergen's decision. We provide a summary to contextualize our decision.

Robert has struggled with substance abuse for decades, with periods of treatment and sobriety followed by relapse. He also has an extensive criminal history, including over thirty arrests, most of which were for possession or distribution of controlled dangerous substances (CDS).

The Division's involvement began in 2014 with reports of domestic violence and mental-health concerns implicating Harry's safety. Robert and

A-2229-24

Harry's mother, A.W. (Anna),[2] were at varying times the child's primary caretakers until August 22, 2017, when the Division was granted custody after Anna had left Harry and his sibling unattended at a YMCA with a note stating she could no longer care for them and she would not be returning. The following month, Harry was placed in a non-relative resource home.

Robert relocated from Florida and was permitted supervised visitation with Harry while the Division retained custody; his visitation transitioned to unsupervised parenting time in 2018. Robert completed a parenting-skills program, participated in psychological and psychiatric evaluations, and attended counseling. In a 2017 psychological evaluation, Robert acknowledged having been arrested several times for drug possession.

Effective February 28, 2019, Robert was granted custody of Harry. About one month later, Harry was again removed after a domestic-violence incident between Robert and Anna, who had started visiting Harry under Robert's supervision. The Division was again granted custody and Robert was permitted supervised visitation, while Harry was placed with another unrelated resource parent.

---

[2] Anna's parental rights were terminated by prior court order, and she is not a party to this appeal.

Robert subsequently tested positive for amphetamines, opiates and cocaine on several occasions. Robert attended substance-abuse program intakes and some treatment sessions but was repeatedly discharged for failing to appear, testing positive for multiple drugs, and not completing recommended levels of care. Robert attributed his inconsistency in treatment programs to housing instability, insurance limitations, and emotional distress related to his separation from Harry.

During the remainder of 2019, Robert's supervised visitation with Harry was sporadic. Although the Division set up family team meetings and supervised visitation, Robert largely did not participate. Throughout this time, Robert attended several detox programs, refused other recommended treatment, and tested positive for various drugs.

In February 2020, the Division filed a guardianship complaint, and the court issued an order to show cause. Following a May 2021 trial, a Family Part judge denied the Division's initial guardianship petition and dismissed the case, citing the father-child bond and the absence of a permanent adoptive placement.

After dismissal of the first guardianship action and through 2022, Robert continued to struggle with sobriety and inconsistently engaged in services and participated in substance-abuse programs. Meanwhile, Harry transitioned

5

through several placements with unrelated resource parents due in part to his behavioral issues.

Updated psychological and bonding evaluations completed in December 2021 demonstrated a continued emotional bond between Robert and Harry, and that termination would likely cause emotional harm. However, the evaluators also expressed concern regarding Robert's unresolved substance-use issues. Robert reported that because his life was "chaotic" and a "mess," he was not ready to take custody of his son at that time, but he was nevertheless unwilling to surrender his parental rights. Robert's supervised visits with Harry continued to be intermittent—Robert missed visits because he canceled, was under the influence of drugs, or was incarcerated. On March 10, 2022, Robert was sentenced to one-year of probation for failure to make proper disposition of CDS, N.J.S.A. 2C:35-10(c).

Eleven days later, the Division filed a new guardianship complaint. Robert failed to appear for the April 14, 2022 hearing and the rescheduled June and September hearing dates. Nevertheless, the court continued Robert's ability to have supervised visitation and ordered him to submit to random urinalysis.

In July 2022, Harry was placed with his current resource parent, S.M. (Samantha). Samantha expressed a commitment to adoption rather than kinship

legal guardianship (KLG). She also supported continued contact between Harry and his father, subject to appropriate boundaries.

In October 2022, Robert was incarcerated on federal CDS charges, resulting in the termination of his probation. He admitted using heroin and cocaine prior to incarceration. While in jail, Robert maintained contact with Harry through phone calls, video visits, and limited in-person visits. As of February 2023, Harry had become increasingly uncomfortable visiting his father in jail and requested that he no longer visit him there.

In March 2023, after a second guardianship trial, a Family Part judge terminated Robert and Anna's parental rights but permitted Robert continued supervised contact at Harry's discretion. Robert appealed.

While the appeal was pending, Samantha continued to facilitate phone contact between Robert and Harry, but Robert did not always call. Although in-person visits at the jail were at Harry's discretion, he did not want to go. After his release on bail in June 2023, Robert relocated to various recovery houses. Other than a September 27 phone call, Harry refused contact with Robert until October 13, when he had one in-person supervised visit with his father. However, Harry displayed behavioral issues after the visit and then subsequently refused to see his father.

7

On May 15, 2024, Robert pleaded guilty to the federal charges, including conspiracy to distribute heroin, fentanyl, and crack cocaine from December 2021 through September 2022 and maintaining his apartment for the purpose of distributing CDS. His bail was revoked in August 2024.

On October 28, 2024, we reversed the March 2023 guardianship judgment as to Robert, concluding the trial court had violated Robert's due-process rights by demonstrating bias and relying on facts from a prior proceeding without an adequate record. We remanded the matter for a new trial before a different judge and did not reach the merits of the statutory best-interests analysis.

On February 14, 2025, the third guardianship trial commenced. The Division proffered various exhibits along with the testimony of Dr. Barry Katz, Ph.D., Samantha, and the Division's adoption specialist. Neither the Law Guardian nor Robert proffered any evidence. Robert remained incarcerated at the time of trial pending sentencing on the federal charges.

Dr. Katz, the Division's expert in psychology as it relates to bonding and parental fitness, testified to conducting a psychological evaluation of Robert along with separate comparative bonding evaluations of Harry with Robert and with Samantha. Dr. Katz diagnosed Robert with antisocial personality disorder along with substance use disorder and concluded Robert was unable to parent

8

Harry in the foreseeable future due to chronic substance abuse, criminal behavior, and instability.

During the evaluation, Robert expressed his belief that his addiction could not be used to terminate his parental rights. Dr. Katz testified that the record was replete with evidence of Robert's chronic failure to comply with court orders, inability to maintain sobriety, and disrupted visitation with Harry for reasons such as appearing under the influence. Robert believed his entire case was "a[n] issue of circumstance" where he was "caught up in bureaucracy." Dr. Katz explained that Robert withdrew from visits altogether and "seemed oblivious to how such abandonment could cause harm to [Harry]." Dr. Katz found Robert's lack of control well-established in the record.

Dr. Katz testified that Harry considers Samantha his primary nurturing figure and has a secure attachment with her, describing her as "mom." Harry expressed an unequivocal desire to remain with Samantha and to be adopted by her.

Harry was ambiguous about living with his father and did not recall the last time he had seen him, but he remembered it was in jail. In observing Robert and Harry's interaction, Dr. Katz concluded that Harry loves his father but Robert could not be relied on to consistently meet Harry's needs. He added that

A-2229-24

should Robert regain custody and then relapse, Harry could have further "abandonment issues . . . additional trauma and a very strong likelihood of . . . behavioral and emotional problems." Harry told Dr. Katz that he wanted contact with Robert and would be sad if his visits ceased. Thus, Dr. Katz testified that if Harry wants a continued relationship with Robert, it would be reasonable and prudent for Samantha to allow it because she would be in control of the contact.

Dr. Katz further opined that if Harry's relationship with Samantha were to be disrupted, he would suffer severe and enduring harm that Robert could not mitigate. Conversely, if Robert's rights were terminated, Harry would not be harmed because he is ambiguous towards the relationship with his father; thus, he concluded termination of Robert's rights would do more good than harm. Dr. Katz testified that there are no services the Division could offer Robert that would make him a viable parenting option for Harry.

The Division's adoption specialist testified that Samantha is Harry's seventh placement. Several friends and relatives were assessed, but none were viable placement options. The Division spoke with Samantha about the differences between KLG and adoption on multiple occasions. The adoption specialist confirmed that Samantha was committed to adopting Harry and was

not interested in KLG. The specialist also testified that Harry had relayed to her that he would love to be adopted by Samantha.

Samantha testified that Harry was thriving in her care. She reported he was doing well academically and socially and receiving therapeutic services for attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD). She reiterated her commitment to adoption and her intention to permit Harry to have continued contact with Robert, if appropriate. She testified that she had always been committed to adoption and never considered KLG as a viable option.

On March 7, 2025, Judge Grimbergen entered a judgment terminating Robert's parental rights, concluding the Division had established the four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. After finding that all three witnesses testified credibly, the judge considered whether the evidence in the record met the statutory predicate.

Judge Grimbergen found the first prong was satisfied because Robert's untreated substance abuse had contributed to his housing instability, lack of employment, and inconsistent visitation and it was clear that the parental relationship had harmed Harry. The judge found under the second prong that

Robert's continual failure to properly address his substance-abuse issues demonstrated his inability to eliminate the harm posed to Harry.

Judge Grimbergen found the first part of the third prong satisfied because the Division had referred Robert to numerous substance-abuse, parenting-skills and counseling services along with multiple psychological and psychiatric evaluations. Under the second part of the third prong, Judge Grimbergen concluded that the Division had assessed numerous friends and relatives for possible permanent placement, but none were viable. Further, the judge found KLG was not in Harry's best interests because "permanency is critical" and it would be disrupted should Robert move to vacate KLG.

Judge Grimbergen relied on the bonding evaluations and unrefuted testimony of Dr. Katz to conclude the fourth prong was satisfied. The judge found that if Harry's relationship with Samantha is disrupted, he would suffer severe and enduring harm, whereas Harry would not face any problems from the termination of Robert's parental rights because Harry was already ambiguous toward the relationship with Robert.

Robert remained incarcerated at the time the judgment was entered. Judge Grimbergen permitted continued supervised contact between Robert and Harry at the now-twelve-year-old child's discretion.

A-2229-24

On appeal, Robert challenges the judge's findings on all prongs of the statute, arguing the trial court's findings are not supported by the weight of the evidence. Additionally, Robert argues the third prong could not have been met as a matter of law because Harry's wishes were not considered and Samantha's expressed preference for adoption over KLG was not knowing and informed.

## II.

### A.

"Review of a trial court's termination of parental rights is limited." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 278 (2007). We uphold the trial court's factual findings if they are supported by substantial credible evidence in the record. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012). Credibility determinations are entitled to particular deference due to the trial court's superior position in evaluating the veracity of witnesses. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "Indeed, we defer to family part judges 'unless they are so wide of the mark that our intervention is required to avert an injustice.'" N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 365, (2017) (quoting F.M., 211 N.J. at 427).

B.

Under this lens, we affirm the termination of Robert's parental rights, substantially for the sound reasons expressed in Judge Grimbergen's written opinion. The record demonstrates no error in the judge's conclusion that all four prongs of the statutory best-interest analysis have been satisfied by clear and convincing evidence.

1.

Under the first prong, N.J.S.A. 30:4C-15.1(a)(1), "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999)). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)).

Although courts have determined that drug use alone is not enough to show harm, substance abuse in the long-term often impacts multiple issues affecting a child's well-being. N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 221-22 (App. Div. 1996). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm

A-2229-24

that endangers the health and development of the child." D.M.H., 161 N.J. at 379.

We discern no error with Judge Grimbergen's conclusion that Robert's long-standing substance abuse, criminal involvement, and instability over an extended period harmed Harry. Robert acknowledged decades-long abuse of cocaine, heroin, and other substances, which was also evidenced by his repeated relapses, failed treatment attempts, and positive drug screens. His substance abuse was coupled with housing instability, unemployment, and recurrent incarceration, most recently exemplified by his federal incarceration during the guardianship trial.

Although Robert was reunified with Harry for about one month in 2019, Robert relapsed shortly after his son's removal, because of alleged domestic violence in the household, and then failed to continue ongoing treatment for substance abuse. Robert's pattern of temporary improvement followed by relapse exposed Harry to harm through repeated placement disruptions, as Harry expressed to Dr. Katz.

Robert's inability to maintain a safe and stable environment accounted for Harry's multiple removals and placement disruptions for seven-and-a-half out of his then-eleven years. As Dr. Katz opined, these disruptions have led to "even

greater trauma and attachment issues" for Harry. Thus, we discern no error in Judge Grimbergen's conclusion that the clear and convincing evidence in the record demonstrated the cumulative effect of Robert's parental relationship harmed Harry, satisfying the first prong.

2.

Under prong two, the Division must prove by clear and convincing evidence that "the parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2).

The court may also consider "parental dereliction and irresponsibility, such as the parent's . . . inability to provide a stable and protective home or support for the child." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012) (quoting K.H.O., 161 N.J. at 353). This inquiry is meant to evaluate whether the parent has overcome the initial harm that has endangered the child and would be able to continue to parent without exposing the child to additional and recurring harm. N.J. Div. of Child Prot. & Permanency v. R.G., 217 N.J. 527, 557 (2014).

Here, despite Robert receiving extensive services over several years, he was unable to achieve sustained sobriety or stability, which affected his ability to parent Harry. The Division provided repeated substance-abuse evaluations, outpatient and intensive treatment referrals, psychological services, parenting programs, and visitation opportunities, as well as housing, transportation, and financial assistance. Although Robert intermittently engaged with these services, he was repeatedly discharged from treatment for non-compliance and positive drug tests.

By the time of the remand trial, Robert remained incarcerated on federal drug charges and was unavailable to parent Harry. Judge Grimbergen found Dr. Katz had credibly opined that Robert's antisocial personality disorder and chronic substance-use disorder rendered him unable to safely parent Harry in the foreseeable future. There was no evidence before the judge demonstrating that Robert could eliminate the conditions causing Harry harm within a reasonable period of time.

We decline to disturb Judge Grimbergen's finding that the clear and convincing evidence demonstrated that Robert had failed to address his substance-abuse issues, his involvement in the criminal justice system and his instability. Robert's failure to address these issues merits the conclusion that he

17

is unable to eliminate the harm his continued exercise of parental rights poses to Harry.

3.

The third prong of the best-interests test has two parts, requiring first that the Division prove it has made "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home." N.J.S.A. 30:4C-15.1(a)(3). N.J.S.A. 30:4C-15.1(c) defines "reasonable efforts" as "attempts . . . to assist the parent[] in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." Under the second part of prong three, the court must consider alternatives to termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3).

The record reflects sustained efforts by the Division over nearly eight years to provide Robert with the resources and treatment needed to address his substance abuse—the nucleus of the circumstances and conditions that led to Harry's placement. N.J.S.A. 30:4C-15.1(c). Robert was offered parenting instruction, psychological and psychiatric evaluations, individual counseling, repeated substance abuse treatment referrals, supervised and unsupervised visitation, transportation assistance, and housing support. The Division also

facilitated reunification in 2019, demonstrating its commitment to preserving the parental relationship when feasible.

The clear and convincing evidence in the record supports Judge Grimbergen's findings that Robert consistently demonstrated a lack of desire to meaningfully participate in the offered services and there were no additional services the Division could offer to remedy the issues that led to removal.

In evaluating the second part of the third prong, the judge properly considered the evidence of alternatives to termination in the record. Relative placements were investigated and ruled out, as established by the Division's adoption specialist's credible trial testimony. However, crediting Dr. Katz's unrebutted opinion that "permanency was critical," Judge Grimbergen found that KLG did not provide an adequate degree of permanency because Robert could file an application to vacate the KLG arrangement. Robert challenges this finding, asserting that "[i]f the mere fact that a parent could file a motion to set aside KLG eliminates it from consideration, then KLG could never be considered a permanency option."

We depart from Judge Grimbergen's reasoning on this issue because KLG is indeed an available permanency plan to be considered even if the biological parent can move to vacate the arrangement. See N.J. Div. of Child Prot. &

Permanency v. D.A., 477 N.J. Super. 63, 82 (App. Div. 2023) (noting that "[o]ur jurisprudence recognizes two permanency options: KLG and adoption" and that "KLG is considered an alternative to termination of parental rights that offers permanency and stability to a child"); see also N.J.S.A. 3B:12A-6(f) (permitting a parent whose parental rights were formerly terminated to move to vacate a KLG arrangement if they cure "their incapacity or inability to care for the child").

Nonetheless, we discern no error in the judge's ultimate finding that the third prong was satisfied by clear and convincing evidence. See Atl. Ambulance Corp. v. Cullum, 451 N.J. Super. 247, 264 (App. Div. 2017) (finding the Appellate Division "affirm[s] or reverse[s] judgments and orders, not reasons"). Here, KLG was not a viable alternative because Samantha, the parental figure with whom Harry had formed a primary bond, was committed to adoption. Thus, the permanency between Harry and Samantha that Dr. Katz recommended could not be accomplished through KLG in this case.

If a resource parent is adequately informed of the "potential benefits and burdens of KLG before deciding whether he or she wishes to adopt," the resource parent's "preference between [KLG and adoption] should matter." N.J. Div. of Youth & Fam. Servs. v. M.M., 459 N.J. Super. 246, 263 (App. Div.

2019).  Based on the credible testimony of the Division's adoption specialist, Samantha was informed of the difference between KLG and adoption and repeatedly expressed that adoption was always her goal.  Samantha again expressed her preference for adoption at trial.  Although we are cognizant that a resource parent "should not be placed in the role . . . as the ultimate 'decision-maker,'" id. at 262, the resource parent's consistently stated desire to adopt to the exclusion of KLG, if in a child's best interest, warrants the conclusion that KLG is not a viable alternative.

Robert also argues the trial court erred by not considering Harry's wishes as to permanency.  This argument is unavailing.  Although Robert is correct that "the family court must hear from and consider the wishes of a child" if they are beyond a certain age, M.M., 459 N.J. Super. at 264, that age is twelve—not ten, as Robert suggests.  See N.J.S.A. 3B:12A-6(a)(7).  Because Harry did not turn twelve until December 2025, after the guardianship trial, the court was not obligated to consider testimony from him as to his wishes before terminating Robert's parental rights.  In any event, the judge considered Harry's wishes—which were to be adopted by Samantha and remain in her custody—as relayed to Dr. Katz and the Division's adoption specialist.

21

Under prong four, termination of parental rights must "not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The issue is "whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108.

Consideration of a child's bond with a resource parent furthers "the State's parens patriae obligation to protect the welfare of children." D.C.A., 256 N.J. at 27. Generally, the Division's proofs should include testimony by an expert who has had an opportunity to make a "comprehensive, objective, and informed evaluation of the child's relationship with the foster parent." Id. at 22 (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)). The court must also consider "parallel proof relating to the child's relationship with his or her natural parents in assessing the existence, nature, and extent of the harm facing the child." N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009) (quoting J.C., 129 N.J. at 19).

Dr. Katz's unrebutted, credible testimony established that Harry has a secure attachment to Samantha, whom he considers his primary parental influence. Further, Harry has expressed a desire to be adopted by Samantha.

Dr. Katz opined removal from Samantha would cause severe and enduring harm that Robert could not mitigate.

In contrast, while Harry has shared an affectionate bond with Robert, that attachment was characterized as insecure and anxiety-provoking, shaped by Robert's repeated absences, relapses, drug impairment at visitation, and periods of withdrawal from Harry's life due largely to incarceration and insobriety. Judge Grimbergen found Dr. Katz had credibly concluded termination would not cause greater harm than continuation of the parental relationship and, in fact, would alleviate the uncertainty that has marked Harry's childhood. The judge's decision to permit continued supervised contact at Harry's discretion, based on Samantha's expressed desire to foster the relationship, further mitigates any potential emotional impact to Harry that might stem from the termination of Robert's parental rights, while preserving the child's right to permanency.

In sum, the order terminating Robert's parental rights is amply supported by the clear and convincing credible evidence in the record. Thus, we affirm substantially for the reasons expressed in Judge Grimbergen's written opinion.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hawley

Clerk of the Appellate Division

A-2229-24