# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3552-24

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

R.G.,

     Defendant-Appellant,

and

C.F. and R.G.,[1]

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.G.,
J.G., and J.G., minors.

_____

Submitted March 25, 2026 – Decided April 13, 2026

---

[1] We refer to the parties and the children by initials and fictitious names to protect their privacy. R. 1:38-3(d)(12).

Before Judges Currier, Smith and Jablonski.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0047-23.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Mark E. Kleiman, Designated Counsel, on the briefs).

Jennifer Davenport, Attorney General, attorney for respondent (Deborah E. Wassel, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Gurdian, attorney for minors J.G., J.G., and J.G. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant R.G. ("Rebecca") appeals from a judgment of guardianship terminating her parental rights to three of her children. Rebecca contends the Division of Child Protection and Permanency ("the Division") failed to prove prongs three and four of the statutory "best interests" test under N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Specifically, Rebecca argues the trial judge incorrectly found the Division made reasonable efforts to help her correct the circumstances that led to the children's out-of-home placement, that he failed to consider alternatives to the termination of her parental rights,

2

A-3552-24

and he failed to find that termination of Rebecca's parental rights would do more harm than good to the children. The Law Guardian supports termination and urges us to affirm the trial judge's order.

Based on our review of the record and the applicable law, we are satisfied the record supports the decision to terminate Rebecca's parental rights. Accordingly, we affirm.

I.

We do not recite in detail the history of the Division's substantial interactions with Rebecca. Instead, we incorporate by reference the factual and legal conclusions contained in the trial judge's comprehensive oral opinion and provide this factual summary for context.

Rebecca is the biological mother of five children. The focus of these proceedings are "Joy" (born 2010), "Janice" (born 2013), and "Jeffrey" (born 2019), none of whom currently reside with her.[2] Co-defendants are the purported biological fathers of Joy and Janice. Jeffrey's father is unknown. The Division has neither been able to establish contact nor to confirm paternity with any of the fathers.

---

[2] Rebecca has two other children: "Jon" (born 2016) and "Jen" (born 2018). Jon and Jen are not the subject of this appeal because they were placed in the physical custody of their biological father.

A-3552-24

The Division began its involvement with Rebecca's family because of Rebecca's history of mental health issues, domestic violence, physical abuse, substance use, and housing instability. In 2017, following a suicide attempt, the Division removed Joy and Janice from Rebecca's care due to medical neglect and inadequate supervision. They were returned to her in 2018.

In 2021, Rebecca was hospitalized again after ingesting large quantities of Xanax and alcohol. The Division's investigation revealed Rebecca continued to suffer from mental health challenges and relied on Joy, who was then ten years old, to care for her siblings. Janice had stopped attending school for several months. Neighbors and friends provided intermittent childcare during Rebecca's hospitalization. Although the Division substantiated neglect, it did not immediately remove the children because Rebecca agreed to comply with mental health treatment and medication. By mid-2021, Rebecca appeared compliant and the children remained with her.

In September 2021, however, Rebecca again overdosed and was hospitalized. Investigation revealed severe food insecurity and continued reliance on the now eleven-year-old Joy for caretaking. Rebecca routinely left the family home late at night, leaving Joy to care for her younger siblings. Janice was still not attending school and periodically lived with a neighbor.

A-3552-24

Based on this continued neglect, the Division removed Joy, Janice, and Jeffrey from Rebecca's care in October 2021 through a Dodd[3] removal. Attempts to place these children with relatives or family friends were unsuccessful due to illness, housing concerns, or their unwillingness to serve. Ultimately, Joy and Janice were placed in a resource home together, and Jeffrey was placed in a separate residence.

After the children were removed, the Division provided Rebecca with referrals for psychiatric and psychological evaluations, therapy, substance abuse treatment, and supervised visitation. Despite these interventions, Rebecca's compliance was inconsistent. She threatened resource parents and Division staff, resulting in the suspension of in-person visitation and discharge from treatment programs. Rebecca continued to exhibit aggressive and erratic behavior, including threats to harm herself and others.

Rebecca was repeatedly advised of the importance of medication compliance and behavioral changes for her to be reunified with her children. However, she continued to demonstrate poor compliance and attitude toward treatment. At various times, Rebecca lost her healthcare coverage and failed to obtain new insurance despite the Division's assistance. Throughout the

---

[3] A Dodd removal is an emergency removal of a child from a parent's custody without a court order under N.J.S.A. 9:6-8.21 to -8.82 known as the Dodd Act.

proceedings, Rebecca suggested potential placement resources, but none were ultimately determined to be viable.

After approving the Division's plan for termination of parental rights followed by adoption of the children by their resource parents, the Division filed for guardianship of the three children in April 2023. As part of those proceedings, the court ordered the Division to schedule psychological, psychiatric, and bonding evaluations.

Trial was scheduled but was adjourned twice to allow Rebecca to complete the evaluations that she missed in both September and December 2024. Ultimately, those examinations were completed in March 2025 by Dr. Robert Kanen, Psy.D., and Dr. Frank Dyer, Ph.D., who both performed forensic psychological evaluations and bonding assessments.

Dr. Kanen found Rebecca functioned in the borderline range of cognitive ability, with poor non-verbal reasoning and impaired judgment. He noted Rebecca was inconsistent with services and lacked insight into her parenting deficits. Dr. Kanen opined that Rebecca was also unable to recognize the risks to her children and carried a poor prognosis for change. His bonding evaluations revealed that Joy and Janice reported past physical abuse and that

6

they did not wish to return to Rebecca. Jeffrey displayed a similar lack of attachment to Rebecca.

Dr. Dyer noted Rebecca's longstanding emotional instability, aggression, and lack of impulse control. He observed Rebecca minimized the severity of her mental health episodes and failed to appreciate the circumstances that led to the removal of her children from her care. Dr. Dyer concluded Rebecca did not possess adequate parental capacity and that she had no realistic prospect for improvement. He also reported the children expressed clear wishes to remain in their respective resource homes. Joy and Janice both described their current placement as their "first ever home." Jeffrey expressed an aversion to any contact with Rebecca.

Both experts acknowledged secure attachments between the children and their resource families. Both opined the three children would suffer significant harm if they were removed from their current placements but would not suffer harm if contact with Rebecca were severed. Both concluded Rebecca lacked the capacity to mitigate these harms.

The Division consistently explored alternative placements with relatives and family friends, but none proved suitable or willing to serve as resource parents. Both resource families committed to adoption, and the children

7

themselves expressed their desire to remain in their current placements and to be adopted by their resource parents.

The guardianship trial was held over four non-consecutive days between May 15 and June 12, 2025. The Division presented testimony from the children's resource parents, its caseworker, and Dr. Kanen. The Law Guardian, who supported the Division's plan, called Joy and Janice, and Dr. Dyer. Rebecca did not testify, nor did she produce witnesses or evidence.

In a comprehensive oral opinion, the trial judge found the Division and Law Guardian's witnesses to be credible and considered the statutory four-pronged "best interests" test, N.J.S.A. 30:4C-15.1(a).

He concluded the Division proved by clear and convincing evidence that the children's health, safety and development have been or would be endangered by Rebecca's parental relationship to satisfy the first prong. Specifically, the court addressed how Rebecca placed Joy, at age ten, into the role of caretaker for her younger siblings and even had to contact emergency services when Rebecca overdosed on Xanax. This emotional and psychological harm that flowed from Rebecca's actions was "self-evident" to the judge. Moreover, the trial judge concluded that all three children had been placed at risk of harm due to Rebecca's failure to provide food and

supervision, and that they also had been deprived of parental nurturance due to the suspended visits resulting from Rebecca's threats and aggression towards others.

As to the second prong, citing Rebecca's failure and refusal to address her mental health concerns, the trial judge concluded Rebecca was both unable and unwilling to eliminate the harm she caused. Although the trial judge credited her recent attempts to engage in mental health services, he found that those services had not addressed her underlying problems.

The trial judge found the record to be "replete" with evidence that the Division made reasonable efforts to provide remedial services to Rebecca to satisfy the third prong of the test. He held the Division offered services related to the issues that led to out-of-home placement of the children including many evaluations, mental health and substance abuse services, and parenting time. The trial judge also noted that there were no alternatives to termination of parental rights because, "as a result of the conduct of the mother," the resource parents were willing to consider Kinship Legal Guardianship ("KLG"), and the caregivers were committed to providing permanent, safe, stable homes for the children.

9

Finally, the trial judge held the Division established that termination of Rebecca's parental rights to the three children would not do more harm to them than good. The trial court contrasted the children's bonding relationships with Rebecca and their respective resource parents, and stated:

> Here, the bonding relationship with the mother is – it's not stable. It's not nurturing. It's not protective. It's not consistent.
>
> On the other hand, the relationship with the foster parents, as described in the – as detailed in the report and the testimony of the experts, it is as it should be. It's appropriate. It's stable. It provides ongoing care, nurture, guidance for the children whose needs are being met at a very high level.

Based on his findings, the trial judge terminated Rebecca's parental rights. This appeal followed.

## II.

"Our scope of review on appeals from orders terminating parental rights is limited." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 256 (App. Div. 2019). We review a trial judge's factual findings "in accordance with a deferential standard . . . ." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 19 (2023). We uphold a judge's findings if they are supported by "adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). We do so because

we acknowledge the Family Part's special expertise in these matters combined with the limitations of reviewing a cold record. See N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). Therefore, "[w]e will not overturn a family court's fact[-]findings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

## III.

We conclude the court's factual findings are supported by substantial credible evidence and agree with the trial court's legal conclusions regarding all four prongs of N.J.S.A. 30:4C-15.1(a). Before us, Rebecca does not challenge the sufficiency of the Division's proofs as to prongs one and two of the "best interests" test. Since she limits her arguments only to prongs three and four, we focus our analysis on those two elements.

## A.

Prong three requires the Division to prove it provided reasonable efforts to reunite Rebecca with her family and for the trial court to "consider[] alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). The Division's efforts must be analyzed "with reference to the circumstances of the individual case," including the parent's degree of participation. In re

11

Guardianship of DMH, 161 N.J. 365, 390 (1999). Courts do not measure reasonableness by the "success" of the efforts. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 90 (App. Div. 2013) (quoting DMH, 161 N.J. at 393).

Rebecca argues the trial judge erred in finding that the Division made reasonable efforts to provide her with the services necessary to address the issues that led to her children's out-of-home placement. For the first time on appeal, she also contends the Division failed to conduct a neurological examination to assess the effects of a head injury that was caused by a prior accident. Additionally, Rebecca asserts that the Division did not adequately assist her in resolving her health insurance lapses, which affected her access to medication and mental health services, and failed to obtain key records from her current psychiatrist despite her authorization. We disagree.

First, we decline to address Rebecca's claim that the Division failed to conduct a neurological examination because this issue was not raised at the trial level and does not meet the plain error standard set forth in Rule 2:10-2. See Neider v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Moreover, we find no indication that the trial court's alleged omission is within this court's jurisdiction nor implicates a matter of substantial public interest. R. 2:10-2.

12

Second, as to the remaining errors alleged, the trial court credited the Division's efforts in providing substantial rehabilitative services, both in quantity and in substance, stating:

> [T]he record is replete with efforts made by the Division, including various evaluations, not only providing services to the children, but services to the mother, psychiatric evaluations, psychological evaluations, bonding evaluations, supervised visitation, mental health treatment services, housing assistance, random urine screens and substance abuse evaluations and substance abuse treatment programs.

The record also contains numerous occasions when Rebecca failed to appear for assessments, scheduled parenting time, and treatment. It appeared, therefore, that Rebecca's own behavior made it impracticable for the Division to provide the services she now requests. Therefore, we discern no error in the trial judge's analysis nor his conclusion regarding this point of error.

Additionally, the Division must demonstrate it explored alternatives to termination of parental rights in its proposed permanent placement of the children. N.J.S.A. 30:4C-15.1(a)(3). Rebecca argues the trial court erred by failing to properly consider alternatives to termination of her parental rights, such as KLG or placement with family members or friends she identified. She contends the Division's records are unclear regarding the steps taken to evaluate these candidates, and that insufficient evidence was presented at trial

13

about the outcome of these assessments, including whether any proposed relatives were ruled out and the reasons for those decisions. Additionally, she objects to the resource families' refusal to consider KLG over adoption, maintaining that "kinship care" is preferred under recent statutory amendments. We find these arguments unpersuasive and are satisfied that the trial judge appropriately considered KLG as an alternative to terminating Rebecca's parental rights, ultimately determining KLG was not a viable option.

Under N.J.S.A. 30:4C-15.1(a)(3), KLG is "considered an alternative to termination of parental rights that offers permanency and stability to a child residing with a relative or kinship caregiver." N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 82-83 (App. Div. 2023). "The decision of a resource parent to choose adoption over KLG must be an informed one," M.M. 459 N.J. Super. at 260, and must be "unconditional, unambiguous, and unqualified." Id. at 264. Once the caregiver is provided with information regarding the benefits and burdens of a KLG, the caretaker's preference between the two alternatives "should matter." Id. at 263. Moreover, neither the Division nor the trial court may force a resource parent or relative to become a KLG. See D.C.A., 256 N.J. at 24 n.8 ("When a court orders KLG, the child is placed with a caregiver with whom the child has a

kinship relationship and 'who is willing to assume care of a child due to parental incapacity, with the intent to raise the child to adulthood.'" (quoting N.J.S.A. 3B:12A-2)).

Here, the Division's caseworker testified about her consultations with the non-relative resource homes concerning both KLG and adoption. The trial court found that "the Division explored all of the family resources and they were either self-disqualifying or [were] disqualified as a result of the Division's efforts to investigate." Our review of the record confirms that both resource families made informed and deliberate decisions in favor of adoption over any discussed alternatives. The resource parents' preference for adoption would ensure permanency for Joy, Janice, and Jeffrey, protecting them from any disruption that might result from Rebecca's attempts to obtain custody or to continue with parenting time. The trial judge's determination that the Division proved both aspects of prong three by clear and convincing evidence is supported by substantial evidence in the record.

## B.

Prong four requires the court to determine whether termination of parental rights "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "[T]he fourth prong 'serves as a fail-safe against termination even where the

A-3552-24

remaining standards have been met.'" R.G., 217 N.J. at 559 (quoting E.P., 196 N.J. at 108). "The question is 'not whether a biological mother or father is a worthy parent, but whether a child's interest[s] will best be served by completely terminating the child's relationship with that parent.'" Ibid. (quoting E.P., 196 N.J. at 108).

This analysis "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." In re Guardianship of K.H.O., 161 N.J. 337, 355 (1999). Instead, "[t]he question . . . is whether, after considering and balancing the two relationships, . . . child[ren] will suffer a greater harm from the termination of ties with [their biological] parents than from the permanent disruption of [their] relationship with [the] foster parents." Ibid. Courts have "long considered a child's relationship with a resource family . . . when [it] applie[s] the four[th] prong." D.C.A., 256 N.J. at 23.

Vital under prong four is consideration of "[a] child's need for permanency." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) (citing K.H.O., 161 N.J. at 357-58). "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. Critically, children should not "languish indefinitely" in a

16

resource placement while a parent attempts to correct parenting difficulties. N.J. Div. of Youth & Fam. Servs v. S.F., 392 N.J. Super. 201, 209 (App. Div. 2007).

Based on our review of the record, we are convinced the trial judge correctly applied prong four and determined termination of Rebecca's parental rights to her children would not do more harm than good to them.

Here, considering this element, the trial judge relied primarily on the uncontroverted expert testimony, stating:

> [Dr. Kanen] concludes that [Rebecca] remains at the risk of poor decision-making and impulsivity. She is likely to have severe difficulties being a predictable, consistent and reliable caretaker. She has ongoing mental health problems which are chronic in nature. The recommendation is that the children [are] not to be returned to her care, because it would expose the children to an unnecessary risk of harm. The prognosis is poor. [Rebecca] cannot provide her children with a permanent, safe, secure home now or in the future.
>
> . . . .
>
> I have detailed why . . . the [c]ourt is clearly convinced that the mother has demonstrated an unwillingness or an inability to eliminate the harm, lacks insight, lacks judgment, low cognitive function, [is] non-compliant, not committed to addressing her mental health concerns, [and] finds . . . herself to have no parenting deficiencies. There's no need to improve what's already perfect. It clearly shows – her position

17

clearly shows a lack of insight, a lack of judgment. She is unwilling and unable to eliminate this harm.

Furthermore, based on bonding evaluations conducted by Drs. Dyer and Kanen, the trial judge determined that terminating Rebecca's parental rights would cause little to no harm to the children. Regarding Joy and Janice, both evaluations indicated that the girls have developed a strong attachment to their resource mother, whom they regard as their primary love object, identification figure, and someone they can reliably turn to for support. In particular, Dr. Kanen concluded:

> [Joy] and [Janice] made it very clear that they do not want to live with their biological mother. They want to remain with the foster parents and be adopted by them. When asked what it was like to live with their biological mother, [Joy] reported that the mother has a bad temper and would hit her and her sister. She reported that it is sad to see her mother. [Joy] slipped into a depressive mood when talking about her experience with her biological mother.
>
> When [Janice] was asked what it was like to live with her mother, she stated, "it was bad. Everything was bad."

As to Jeffrey, both bonding evaluations noted that he also is securely attached to his foster parents, perceives them as parental figures, spontaneously calls them "Mommy" and "Daddy." Concluding that Jeffrey

18

wishes to be adopted by his resource parents rather than return to Rebecca, Dr. Dyer wrote:

> When asked whether it would be a good thing or a bad thing if he went to live with his other mommy, [Jeffrey] replied, "Bad thing." When asked the same question about staying with this mommy and daddy forever, he replied "Good." When asked to explain, he responded "'Because I love them.[']"
>
> The resource parents are [Jeffrey]'s primary source of nurturance, affection, emotional security, and protection. It is the resource parents to whom this child can confidently turn for comforting in times of distress and protection in times of perceived danger. If anything, this boy's attitude toward his birth mother may be described as negative. There is no indication that he is attached to her in any sense.

Furthermore, the court's decision was based neither on the presence nor absence of a bond between Rebecca and the children. Rather, it centered on the children's need for permanency and Rebecca's inability to care for them in the foreseeable future. Joy and Janice are currently in the care of Family C, who have expressed a genuine desire to adopt the girls, thereby fulfilling both the court's and the Division's objective of securing permanent homes for them. Similarly, Jeffrey is placed with Family T, who have also stated their intention to adopt him as their son.

A-3552-24

The unrebutted testimony confirms that the children are thriving in loving and caring homes where their needs are being met for the first time in their lives. They attend school, play sports, are considering higher education, and participate in extracurricular activities. The trial judge's findings are supported by competent evidence in the record, and he correctly determined that the Division proved prong four by clear and convincing evidence.

To the extent we have not addressed any of Rebecca's remaining arguments, we conclude those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

20                                                    A-3552-24